FILED
2023 Mar-21  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

JOSE

| | |
|---|---|
| **Joseph Allen Renney,** | |
| *Plaintiff* | **Civil Action No.** |
| **v.** | **Jury Trial Demanded** |
| **Alabama Department of Corrections ("ADOC"), Commissioner John Hamm, Commissioner Jeff Dunn, Ruth Nagligch, Warden Chadwick Crabtree, Warden John Doe I, Warden Deborah Toney, Warden Wexford Health Services, Inc., Dr. Shala, Dr. Gulati, Dr. Pagent, Dr. Blalock, Dr. Evans, Nurse McElroy, Nurse John Doe II, Nurse Miller.** | |
| *Defendants* | |

## <u>COMPLAINT</u>

"We will be scheduling correction in the near future. I highly recommend the surgical procedure to be performed and sooner the better."
-Drs. Russell or Bowman, writing on April 8, 2021.
The recommended surgery did not occur until October 21, 2021.

1.

Plaintiff Joseph Allen Renney files this Complaint against named Defendants, pursuant to both state law and federal law, using 42 U.S.C. § 1983 to vindicate the rights guaranteed to him under the Eighth Amendment to the United States Constitution. Mr. Renney also alleges negligence and medical malpractice claims against Defendants.

2.

While incarcerated at Limestone Correctional facility ("Limestone"), Mr. Renney, a diabetic, suffered three amputations resulting in the loss of all of the toes and approximately the first inch of his left foot. From March 2021 until October 2022, Mr. Renney suffered continued infection and reinfection of the big toe of his left foot. This began in March 2021, Mr. Renney broke his left big toe which quickly became infected. As early as April 8, 2021, an outside

1

podiatrist recommended that Mr. Renney undergo surgery, the "sooner the better," to remove the tip of his left big toe, stop the infection, and preserve the remainder of his foot. But the Defendant medical providers delayed in arranging the surgery. While Defendants occasionally provided oral antibiotics for ten days at a time, they failed to conduct any follow-up for to ensure the oral antibiotics were effective, leading to continued reinfection. Defendants also failed to provide intravenous antibiotics to stop the infection once it was clear that oral antibiotics were not working. The initially recommended surgery did not occur until six months later, in October 21, 2021. By then the infection and progressed and rather than amputating merely the tip of his big left toe, it was necessary to amputate Mr. Renney's entire left big toe.

3.

Mr. Renney continued to suffer ongoing infection and delay for medical care. In February 2022, as a result of never being given proper orthopedic shoes, Mr. Renney fell hard while attempting to navigate stairs in his boot, ripping off the tip of his second toe on his left foot. The infection from his big toe spread to his second toe and within several weeks his second left toe turned black, oozed pus, and was clearly infected; indeed, it literally rotted off while Mr. Renney spent nearly two weeks in the Limestone health care unit in April 2022 waiting on medical providers to schedule a surgical consult for him. Despite his known history of being at risk for a diabetic foot and his recent amputation, Mr. Renney did not receive a surgery appointment until August 2022, by which time his second left toe completely disintegrated.

4.

As a result of the continued delay in 2022, the infection spread into the top of Mr. Renney's left foot, forcing him to have to undergo a third amputation, removing all of the toes on Mr. Renney's left foot and the top one inch of his foot in October 2022.

5.

Finally, Defendant medical providers only administered oral antibiotics, for ten days, on two or three occasions in 2021 and 2022, and intravenous antibiotics, once or twice, in April or September 2022. As early as April 2021, it was clear that Mr. Renney suffered a moderate to severe foot ulcer and possibly presented with osteomyelitis. Yet, the antibiotic treatment Defendant medical providers gave Mr. Renney falls far short of the two to four weeks course of intravenous antibiotics recommended for moderate to severe infections and six to twelve weeks recommended to treat osteomyelitis. If promptly administered in 2021, either oral antibiotic treatment with appropriate monitoring or appropriate intravenous antibiotic treatment would have stopped the spread of infection in Mr. Renney's left foot. In addition, promptly scheduling Mr. Renney's recommended surgery in April 2021 would have stopped the spread of infection in Mr. Renney's left foot.

## JURISDICTION AND VENUE

6.

This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and over deprivations of constitutional rights pursuant to 28 U.S.C. §1343 and 42 U.S.C. § 1983.

7.

Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the state law claims, since those claims are so related to the §1983 action that they from part of the same case and controversy.

8.

Venue is proper under 28 U.S.C. § 1391(b) because (1) a substantial part of the events and omissions giving rise to Mr. Renney's claims occurred within this District and Division and (2) Defendants transact business in this District and Division.

## PARTIES

9.

**Plaintiff Joseph Renney**

Joseph Renney ("Mr. Renney") was at all times relevant to this complaint an

incarcerated individual within the Alabama Department of Corrections ("ADOC") at

Limestone. At all relevant times, Mr. Renney was a citizen of the United States and a resident

of Madison County, Alabama.

10.

**Defendant Alabama Department of Corrections**

Defendant Alabama Department of Corrections ("ADOC") is the state agency that is

legally responsibility for the custody of Mr. Renney. ADOC is responsible for contracting of

medical services for all ADOC facilities, including Limestone. ADOC directly employs or is in

a contractual agreement with all of the other named defendants as primary care providers for

Mr. Renney. At all relevant times, ADOC acted through its employees, staff, and agents.

11.

**Defendant Commissioner John Hamm**

Defendant Hamm is Commissioner of ADOC since January 2022. The Commissioner

of the ADOC is responsible for ADOC, for the independent direction, supervision and control

of ADOC. At all relevant times Defendant Hamm acted under of color of state law. Defendant

Hamm is named in his individual capacity.

12.

**Defendant Commissioner Jeff Dunn**

Defendant Dunn was Commissioner of ADOC from April 1, 2015 until December

2021. The Commissioner of the ADOC is responsible for heading the Alabama Department of

Corrections, for the independent direction, supervision and control of ADOC. At all relevant

times Defendant Dunn acted under color of state law. Defendant Dunn is named in his

individual capacity.

4

13.

**Defendant Ruth Nagligch**

Defendant Naglich, at all relevant times, was the Associate Commissioner of Health Services of ADOC. Defendant Naglich acted under color of state law and is sued in her individual capacity.

14.

**Defendant Warden Chadwick Crabtree**

Defendant Crabtree, sued in his individual capacity, has been the Warden of Limestone since August 1, 2022. As warden, Defendant Crabtree was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there. At all relevant times Defendant Crabtree acted under color of state law.

15.

**Defendant Warden John Doe I**

Defendant Warden John Doe I, sued in his individual capacity, is an assistant Warden of Limestone. As warden, Defendant Warden John Doe I was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there. At all relevant times Defendant Warden John Doe I acted under color of state law.

16.

**Defendant Warden Deborah Toney**

Defendant Toney, sued in her individual capacity, was the Warden of Limestone until August 1, 2022, when she retired after being accused of sexual misconduct, including conducting inappropriate pat down searches of female correctional officers, and presiding over high rates of inmate-on-inmate assaults. As warden, Defendant Toney was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there. At all relevant times Defendant Toney acted under

color of state law.

17.

**Defendant Wexford Health Services, Inc.**

Defendant Wexford Health Services, Inc. ("Wexford") is a corporation with a principal address of 4500 PGA Boulevard Suite 302 Palm Beach Gardens, Fl 33148. It may be served at its registered agent, Prentice Hall Corporation System, Inc., at 641 South Lawrence Street Montgomery, Al 36104. Wexford is a health services company that at all relevant times was legally responsible for providing healthcare for Mr. Renney from March 2021 to the present.

18.

At all relevant times, Defendant Wexford contracted with ADOC, Limestone, and Defendants Wardens Crabtree, John Doe I, and Toney to administer, refer, and approve medical care and treatment for prisoners in the custody of Defendants Wardens Crabtree, John Doe I, Toney, and Limestone.

19.

**Defendant Dr. Shala**

Dr. Shala, at all relevant times, as one of Mr. Renney's treating physicians at Limestone, had a duty to stay updated on Mr. Renney's medical records. Dr. Shala, at all relevant times, knew that administration of oral antibiotics, intravenous antibiotics, and referral to a surgical consult were necessary steps to address Mr. Renney's infected foot, given Mr. Renney's medical history, including his diagnosis of diabetes, amputated toes, repeated fever, and the severely worsening condition of his left foot; yet, Dr. Shala never took these steps in a prompt manner.

20.

**Defendant Dr. Gulati**

Dr. Gulati, at all relevant times, as one of Mr. Renney's treating physicians at Limestone, had a duty to stay updated on Mr. Renney's medical records. Dr. Gulati, at all relevant times, knew that administration of oral antibiotics, intravenous antibiotics, and referral to a surgical

6

consult were necessary steps to address Mr. Renney's infected foot, given Mr. Renney's medical history, including his diagnosis of diabetes, amputated toes, repeated fever, and the severely worsening condition of his left foot; yet, Dr. Gulati never took these steps in a prompt manner.

21.

**Defendant Dr. Pagent**

Dr. Pagent, at all relevant times, as one of Mr. Renney's treating physicians at Limestone, had a duty to stay updated on Mr. Renney's medical records. Dr. Pagent, at all relevant times, knew that administration of oral antibiotics, intravenous antibiotics, and referral to a surgical consult were necessary steps to address Mr. Renney's infected foot, given Mr. Renney's medical history, including his diagnosis of diabetes, amputated toes, repeated fever, and the severely worsening condition of his left foot; yet, Dr. Pagent never took these steps in a prompt manner.

22.

**Defendant Dr. Blalock**

Dr. Blalock, at all relevant times, as one of Mr. Renney's treating physicians at Limestone, had a duty to stay updated on Mr. Renney's medical records. Dr. Blalock, at all relevant times, knew that administration of oral antibiotics, intravenous antibiotics, and referral to a surgical consult were necessary steps to address Mr. Renney's infected foot, given Mr. Renney's medical history, including his diagnosis of diabetes, amputated toes, repeated fever, and the severely worsening condition of his left foot; yet, Dr. Blalock never took these steps in a prompt manner.

23.

**Defendant Dr. Evans**

Dr. Evans, at all relevant times, as one of Mr. Renney's treating physicians at Limestone, had a duty to stay updated on Mr. Renney's medical records. Dr. Evans, at all relevant times, knew that administration of oral antibiotics, intravenous antibiotics, and referral to a surgical consult were necessary steps to address Mr. Renney's infected foot, given Mr. Renney's medical

history, including his diagnosis of diabetes, amputated toes, repeated fever, and the severely

worsening condition of his left foot; yet, Dr. Evans never took these steps in a prompt manner.

24.

**Defendant Nurse McElroy (unsure of spelling)**

At all times relevant to this Complaint, Defendant Nurse McElroy was an independent

contractor jointly employed by ADOC, Wexford, and a Nurse at Limestone. Nurse McElroy is a

director of nurses or nurse administrator and at all relevant times had authority to refer Mr.

Renney to a surgical consult or proscribe the appropriate medical antibiotic treatment. Nurse

McElroy met with Mr. Renney in her capacity as a medical provider. Nurse McElroy had a duty

to, and indeed did, review all of Mr. Renney's medical records prior to meeting with Mr.

Renney. Nurse McElroy, at all relevant times, knew that Mr. Renney suffered from a host of

ailments, including insulin dependent diabetes, amputated toes, and open ulcers on his foot. At

no time did Nurse McElroy request that Mr. Renney be given oral antibiotics, intravenous

antibiotics, or be sent to a specialist or prioritized for a surgical consult in a prompt manner.

25.

**Defendant Nurse Miller**

At all times relevant to this Complaint, Defendant Nurse Miller was an independent

contractor jointly employed by ADOC, Wexford, and a Nurse at Limestone. Nurse Miller met

with Mr. Renney in her capacity as a medical provider. Nurse Miller had a duty to, and indeed

did, review all of Mr. Renney's medical records prior to meeting with Mr. Renney. Nurse Miller,

at all relevant times, knew that Mr. Renney suffered from a host of ailments, including insulin

dependent diabetes, amputated toes, and open ulcers on his foot. At no time did Nurse Miller

request that Mr. Renney be given oral antibiotics, intravenous antibiotics, or be sent to a

specialist or prioritized for a surgical consult in a prompt manner.

26.

**Defendant Nurse John Doe II**

At all times relevant to this Complaint, Defendant Nurse John Doe II was an independent contractor jointly employed by ADOC, Wexford, and a Nurse at Limestone. Nurse John Doe II met with Mr. Renney in his capacity as a medical provider. Nurse John Doe II had a duty to, and indeed did, review all of Mr. Renney's medical records prior to meeting with Mr. Renney. Nurse John Doe II, at all relevant times, knew that Mr. Renney suffered from a host of ailments, including insulin dependent diabetes, amputated toes, and open ulcers on his foot. At no time did Nurse John Doe II request that Mr. Renney be given intravenous antibiotics or be sent to a specialist or prioritized for a surgical consult in a prompt manner.

**RELEVANT FACTS**
**A. The Standard of Care for Patients with a Diabetic Foot**

27.

In patients with diabetes, any foot infection is potentially serious. Diabetic foot infections present a risk of developing into foot ulcers and leading to osteomyelitis (bone infection) and amputation. Prompt diagnosis and proper treatment is necessary to prevent amputation. Nearly half of diabetic foot amputations could be prevented with appropriate treatment and wound care.

28.

The standard of care with respect to a diabetic person with an infected diabetic foot requires aggressive surgical debridement and wound management and administering effective antibiotic therapy.

29.

All patients suffering from a diabetic foot infection should receive wound care, which may consist of incision and drainage to decrease bacterial load around a wound, debridement to remove necrotic tissues, redistribute pressure off the wound (also called offloading), and appropriate dressings to allow for optimal wound healing. To allow for healing and relieve pressure from the

wound is indicated, the standard of care recommends that custom-made therapeutic footwear (orthopedic shoes) be prescribed.

30.

Certain factors increase the likelihood of osteomyelitis. These include (1) grossly visible bone or ability or ability to probe to bone and (2) if an ulcer lasts in duration longer than one to two weeks.

31.

Mild soft tissue infections can be treated effectively with oral antibiotics, such as dicloxacillin, cephalexin, and clindamycin. Antibiotic therapy should be administered in conjunction with wound care until there is evidence that the infection has resolved, usually one to two weeks of therapy. Close follow-up is important to ensure continued improvement and to evaluate the need for modification of the antibiotic therapy, imaging, or surgical intervention. The antibiotic treatment should be guided by culture samples and analysis.

32.

For moderate to severe soft tissue infections intravenous antibiotics should be administered, usually for two to four weeks. Also, patients requiring surgical correction should receive intravenous antibiotics prior to the surgery. Patients with foot ulcers complicated by osteomyelitis generally require either intravenous antibiotic and surgical treatment or intravenous antibiotic treatment alone, usually for six to twelve weeks.

33.

All patients presenting with a diabetic foot infection should have x-rays of the affected foot performed to look for abnormalities of the bone as well as for soft tissue gas that would indicate infection. A magnetic resonance imaging (MRI) is the imaging method recommended for patients with diabetic foot infections because it permits more sensitive and specific imaging of soft tissue.

**B.  ADOC Health Care Structure**

34.

At all relevant times, Defendants Dunn or Hamm served as the Commissioner of ADOC, overseeing ADOC's vital functions, including prisoner medical treatment.

35.

At all relevant times, Defendant Naglich served as ADOC's Associate Commissioner for Health Services, heading the Officer of Health Services ("OHS"), which is responsible for overseeing the provision of medical care to prisoners.

36.

At all relevant times, under the contracts between ADOC's OHS and Wexford, OHS had access to Wexford's internal documents and records, and Wexford was obligated to send reports, like monthly operating reports and annual compliance reports, to the OHS.

37.

At all relevant times, Defendant Naglich was in charge of contract monitoring and exercising oversight of Wexford's provision of services.

## C. Failures by ADOC to Provide Adequate Health Care to Diabetic Inmates

### a. Contributing Conditions to Denial of Health Care

38.

ADOC and Limestone currently operate under consent decrees entered by Judge Myron Thompson as part of the ongoing class action, *Braggs et al v. Hamm et al*, 2:14-cv-601, (M.D. Ala). In a liability opinion entered on June 27, 2017, the court enumerated factors contributing to Eighth Amendment violations, in addition to an overarching factor that permeates all of the others, what Commissioner Dunn described as a "'two-headed monster': overcrowding and understaffing." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1184 (M.D. Ala. 2017); *see id*. at 1267-68 (the "persistent and severe shortages of mental-health staff and correctional staff.").

39.

At all relevant times, ADOC experienced high rates of prisoner overcrowding, with occupancy rates of up to 175% of the population that its facilities were designed to hold.

40.

At all relevant times, Wexford was understaffed.

41.

ADOC signed a contract with its vendor Wexford that expressly incorporates the Request for Proposal for Comprehensive Inmate Healthcare Services (RFP) issued by ADOC in July 2017, pursuant to which ADOC ultimately selected Wexford. The RFP, in turn, specifies that: "Minimum staffing levels at both the facility and regional management levels are outlined as Appendix F to this RFP."

42.

Appendix F to the RFP required that Limestone have twenty-four Licensed Practical Nurse (LPN) and seven (RN) Registered Nurses.

43.

Wexford has consistently been unable to meet the medical staffing requirements set out in Appendix F to the RFP for Limestone.

44.

Routinely when Mr. Renney spent time in the Limestone healthcare unit in 2021 and 2022 he observed a total of three LPN and RN providing medical care for the entire Limestone facility.

45.

Even assuming the three nurses Mr. Renney observed represented only a single shift, or one-third of the medical staff, that number is far below the number allocated for Limestone. Discovery will further reveal and confirm that Wexford has consistently been unable to meet medical staffing requirements at Limestone.

46.

At all relevant times, the combination of overcrowding and understaffing taxed Wexford's, ADOC's, and Limestone's ability to provide medical treatment to Mr. Renney through: (a) reduced

ability to monitor patients suffering severe and progressive infections, (b) reduced ability to make referrals to outside specialists.

47.

ADOC and Limestone have both consistently reported that they have failed to recruit sufficient number of correctional officers for ADOC facilities.

48.

As of September 30, 2022, ADOC maintained 1,392.5 correctional officers. *Braggs et al,* 2:14-cv-601, Doc. 3901 at 5. This is far fewer correctional officers than the 1,825 officers ADOC employed in June 2017, when Judge Thompson entered his liability order finding understaffing contributed to ADOC's constitutional violations in failing to provide adequate mental healthcare.

49.

In August 2022, WAAY-TV 31 News aired an investigative report on correctional officer staffing levels at Limestone. The report reviewed internal ADOC documents listing staffing requirements for Limestone and found that the facility was supposed to have 716 correctional officers, but only had 165, leaving it short 551 officers.

50.

An ADOC employee interviewed during the broadcast stated that ADOC cared more about stopping whistleblowers from exposing problems regarding understaffing at the facility than trying to fix the problem.

51.

At all relevant times, correctional officers were needed to provide security for prisoners seeking healthcare and escort prisoners from their cells to appointments if they are not in the general population, or to escort prisoners to free world medical consults.

52.

At all relevant times, insufficient correctional staffing led to health appointments being cancelled, impairing treatment for individuals, such as Mr. Renney, needing immediate medical care.

53.

At all relevant times, insufficient correctional staffing led to a high number of inmate-on-inmate assaults and other crises in Limestone. This led to Limestone medical staff being constantly occupied with prioritizing responding to emergency medical procedures and crises, delaying or preventing Limestone medical staff from being able to treat the serious medical needs of other prisoners, like Mr. Renney.

**b. Defendants' Deliberate Indifference to Prisoners' Serious Medical Needs and Contributing Conditions to Denial of Health Care**

54.

Judge Thompson approved the *Braggs* parties' Phase 1 settlement and adopted it as a consent decree on September 9, 2016. The court found that the named plaintiffs had standing and certified a settlement class that included all ADA and Rehabilitation Act claims related to physical disabilities of "any current or future inmate in the physical custody of the Alabama Department of Corrections." *Braggs*, 2:14-cv-601, Doc. 727 at 6; Doc. 728 at 11.[1]

55.

As stated in the *Braggs'* Fifth Amended Complaint, the failure to provide medical care to meet diabetic inmates' medical needs, resulting in injuries or the amputations of limbs like the sort that befell Mr. Renney, are common throughout the ADOC system:

> Because of the DEFENDANTS' deliberate indifference to the obvious medical needs of the persons in their custody, plaintiff prisoners go for months or years without appropriate diagnoses of medical conditions. Numerous prisoners have

---

[1]    In its role as Monitor of the ADA Consent Decrees, on March 10, 2022, ADAP issued its "Report of Monitor Phase 1 Consent Decree for Monitoring Periods July 1, 2021-September 30, 2021." ("Phase 1 Monitoring Report"). The parties remain in negotiations regarding continuing alleged violations to bring ADOC facilities into compliance with the ADA.

died from a failure to treat medical conditions from cancer to diabetes to hepatitis. Others have required emergency surgery or lost the use of legs, arms or eyes, after having been left to suffer with untreated symptoms for lengthy periods. (Fifth Amended Complaint, September 28, 2016, *Braggs*, 2:14-cv-601, Doc. 805 at 2.)

56.

The named Plaintiff in the *Braggs* litigation, Mr. Edward Braggs, was a diabetic housed in the custody of ADOC since 1967. He was most recently housed at Hamilton Aged and Infirmed Center and he was previously housed at Limestone. (*Id*. at 6 ¶ 12.) In approximately 2004, Mr. Braggs's right leg was amputated at the knee due to lack of medical treatment while in prison. He experienced the same symptoms in his left leg that led to the amputation of his right leg and the cause of these symptoms was not treated. (*Id*.)

57.

Plaintiff Christopher Gilbert was housed at Kilby and suffered from diabetes and experienced sugar lows and highs due to improper treatment for his diabetes. (*Id*. at 10 ¶ 21.)

58.

Plaintiff Dwight Hagood was housed at Easterling and confined to a wheelchair and was housed in a non-accessible dormitory with a high level of violence. (*Id*. at 10 ¶ 22.)

59.

In their 2016 Fifth Amended Complaint, the *Braggs* Plaintiffs alleged that ADOC officials have a policy and practice of not providing appropriate nutrition and medicine to control diabetes. For example, Plaintiffs alleged that Plaintiff Gilbert's diabetes was not been well-controlled since he had been in ADOC custody. (*Id*. at 48 ¶ 132.) Since he was at Kilby, his blood sugar level in the early mornings was typically around 300 or 400 milligrams per deciliter (mg/dL); the target level before eating is 70-130 mg/dL. (*Id.*). At other points in the day, he felt his blood sugar level dropping, and he got shaky and broke out into a sweat. He had passed out from low blood sugar between 15 and 20 times in during two years he had been in ADOC custody. (*Id*.) Further, he asked

if he could be placed on a back on a 24-hour insulin but was told by a doctor that he could not because it is too expensive. (*Id.*)

60.

In their 2016 Fifth Amended Complaint, the *Braggs* Plaintiffs alleged that ADOC officials have a policy and practice of denying diabetic prisoners appropriate footwear. (*Id.* at 50 ¶ 139.) Plaintiff Gilbert was given an orthopedic shoe that rubbed the skin off his toe because the shoe was too small. (*Id.*) He asked for a new shoe but was denied and had to cut away the top of the shoe. (*Id.)* Plaintiff Hagood asked for diabetic shoes and was told that because he is in a wheelchair, he does not need shoes. (*Id.*)

61.

At all relevant times, ADOC received monthly statistical reports, annual contract-compliance reports, and conducted regular audits of Wexford.

62.

At all relevant times, the *Braggs* litigation put Defendants ADOC, Hamm, Dunn, Naglich, and Wexford on notice, and such Defendants understood that overcrowding of prisoners and understaffing of correctional officers and medical personnel adversely effected the health of diabetic prisoners.

63.

At all relevant times, Defendants ADOC, Hamm, Dunn, Naglich, and Wexford, reviewed monthly reports listing prisoner deaths and major surgical procedures, including deaths and amputations of diabetic prisoners.

64.

At all relevant times, Defendants ADOC, Hamm, Dunn, Naglich, and Wexford understood that medical treatment for diabetic prisoners remains inadequate across all facilities.

65.

Despite the entry of a consent decree on September 9, 2016 between ADOC and a class of plaintiffs in *Braggs*, Defendants continue to violate the constitutional rights of diabetic prisoners, like Mr. Renney, including by failing to adequately staff prisons with medical providers and correctional officers, provide appropriate medical treatment such intravenous antibiotics for prisoners suffering from diabetic ulcers and provide for prompt referrals to surgical consults to prevent loss of life and limbs for prisoners suffering from diabetic ulcers.

66.

At all relevant times, as a result of the September 9, 2016 *Braggs* consent decree, Defendants ADOC, Hamm, Dunn, Naglich, and Wexford implemented a computerized system identifying and tracking those prisoners with disabilities and the accommodations the prisoners require. The information from this system is produced as a Special Needs report.

67.

At all relevant times, Defendants ADOC, Hamm, Dunn, Naglich, and Wexford understood that medical treatment for diabetic prisoners remains inadequate across all facilities and Limestone.

68.

At all relevant times, Defendants Wardens Crabtree, John Doe I, and Toney, as Wardens of Limestone, had the authority to access the Special Needs report or did access the Special Needs report, listing diabetic prisoners under their custody and their needed accommodations. In addition, these Defendants were aware of the correctional officer and medical understaffing at Limestone. This supports a reasonable inference that at all relevant times these Defendants were aware of the deficiencies of ADOC and Wexford's provision of medical treatment to diabetic prisoners in their custody.

69.

At all relevant times, Defendants Wardens Crabtree, John Doe I, and Toney, as Wardens of Limestone, had the authority to order the provision of appropriate treatment to diabetic prisoners in their custody.

70.

As described herein, ADOC's gross neglect and medical indifference towards treatment of diabetic patients that injured the *Braggs* Plaintiffs is the same policy and practice that injured Mr. Renney, resulting in Mr. Renney's big toe and left second toe being amputated, followed by all the toes of his left foot and the first inch of his left foot being amputated.

**D. In March 2021, Mr. Renney injures his left big toe and the toe becomes infected; despite a consult recommending immediate surgery, Defendants delay the surgery until October 2021, resulting in the loss of Mr. Renney's entire toe**

71.

On or around March 12, 2021 Mr. Renney broke his left big toe while climbing from top bunk to get to bottom bunk. Mr. Renney was given a bottom bunk profile on March 12, 2021, after he injured his left big toe.

72.

In the early 2000s, a court ordered that bunk beds must be eliminated at Limestone prison. The prison facility's failure to abide by this court order was a proximate cause of Mr. Renney's injury.

73.

Mr. Renney was given gauze to clean the wound on his left big toe and wrap it for about seven days.

74.

In March 2021, one of two physicians at Limestone prison, Dr. Gulati, ordered orthopedic shoes for Mr. Renney to assist Mr. Renney's walking around the Limestone facility and aid his left foot in healing. To the present date, Mr. Renney has not received his orthopedic shoes.

18

75.

On April 8, 2021, Mr. Renney was taken for a consult at Podiatry Associates, 1101 18th St S, Birmingham, AL 35205. The medical providers, Drs. Russell and Bowman, recommended that the tip of Mr. Renney's left big toe, up to the first metatarsophalangeal joint, be amputated to prevent spread of infection to the rest of his foot.

76.

Mr. Renney presented with Type 2 diabetes with diabetic neuropathy and a foot ulcer on his left big toe. Drs. Russell or Bowman wrote that Mr. Renney "presents for initial exam and c/c of ulceration on the end of the left big toe."

77.

Drs. Russell or Bowman noted that "AP, lateral, and oblique x-rays demonstrate possible osteomyelitis [bone infection] as well as spurring on the distal hallux."

78.

Drs. Russell or Bowman stated that "[w]e will be scheduling correction in the near future. I highly recommend the surgical procedure to be performed and sooner the better. He will be seeking approval for this through the state in the near future."

79.

Mr. Renney observed Drs. Russell or Bowman provide a copy of the recommendation for surgery, the "sooner the better," and give it to the correctional officer accompanying him.

80.

Mr. Renney went to the health care unit at least three times from April 8, 2021 through July 2021 to request that his wound on his left big toe be cleaned and treated with antiseptic cleanser. During these medical unit visits Mr. Renney was seen by Dr. Gulati, Dr. Shala, Nurse Lamb, and Nurse Bunn.

81.

Each time Mr. Renney had to wait hours to be seen and have his wound attended. There were a lot of stabbings occurring at Limestone during this time period. When an inmate was

stabbed, Mr. Renney would sit and wait to be seen at the medical unit for four to five hours before he could be seen. The wait was due to the understaffing of medical staff at Limestone prison.

82.

Dr. Gulati and Dr. Shala eventually gave him gauze and cleaning solution and told him to clean it on his own.

83.

During April 8, 2021 through July 2021 visits to the health care unit, Defendants Dr. Gulati and Dr. Shala, as well as Nurse Lamb and Nurse Bunn, each reviewed Mr. Renney's medical chart and knew that Drs. Russell or Bowman had ordered that Mr. Renney was to undergo surgery, the "sooner the better" to prevent the spread of infection and possible osteomyelitis. Further, Defendants Dr. Gulati and Dr. Shala each knew that Mr. Renney's left big toe was not healing but instead was becoming increasingly infected because they personally observed the toe turning black and oozing pus and blood when Mr. Renney entered the health care unit and they cleaned his wound or bandaged it with gauze.

84.

Therefore, Defendants Dr. Gulati and Dr. Shala knew that Mr. Renney presented with a moderate to severe foot ulcer and possibly osteomyelitis, requiring administration of intravenous antibiotics and surgery as soon as possible.

85.

On one of these occasions, in April or May 2021, Mr. Renney talked to Defendant Dr. Gulati. Dr. Gulati told him that they were still planning to move forward with the surgery ordered by Drs. Russell or Bowman.

86.

From April 8, 2021, through July 2021, Defendants Dr. Gulati and Dr. Shala did not administer intravenous antibiotics or order Mr. Renney's surgery, despite having the authority to do so.

87.

From April 8, 2021, through July 2021, the infection of Mr. Renney's left big toe worsened. The toe was swelling, black flesh coming up, and oozing blood and pus.

88.

From April 8, 2021 through early July 2021, Mr. Renney had trouble getting gauze to wrap and bandage the wound on his left big toe or solution to clean and disinfect it. The infection in his left big toe routinely caused him to run a fever.

89.

Frustrated by the delay and worried about the spread of infection in his left big toe, in early July 2021 Mr. Renney talked to Mark Williams, an attorney with the U.S. Department of Justice ("DOJ") investigation into Alabama's prisons.

90.

Mr. Williams or another DOJ attorney called Limestone prison and spoke to an official there urging them to go forward with the surgery originally recommended by Drs. Russell or Bowman on April 8, 2021.

91.

On July 15, 2021, Mr. Renney was taken back to Podiatry Associates for what he assumed would be the surgery. Drs. Russell or Bowman also assumed that Mr. Renney was being taken either to undergo the surgery or to have a final preparation and consult for a surgery that was imminent.

92.

On July 15, 2021, Mr. Renney was prepared to undergo the surgery. However, a correctional officer who was present, stopped the operation from going forward on that day and

said that Mr. Renney was just there for a consult, not surgery. Mr. Renney was taken back to

Limestone without the surgery. Drs. Russell or Bowman became agitated with the correctional

guard and warned the correctional guard that Mr. Renney needed surgery immediately.

93.

On July 15, 2021, Drs. Russell or Bowman noted that:

    Pt is seen for evaluation of chronic diabetic ulcer into the hallux. We discussed
    different treatment options and it was determined that removal of the end of the toe
    would give the most beneficial long-term results. All reasonable risks,
    complications, expected outcomes, alternatives methods of treatment and benefits
    for the resection of the spur on the end of the big toe were discussed in detail. Pt
    understood these completely and consent form was signed. No guarantees were
    given as to the results. Scheduled procedure will be done in office in the future.

94.

In July 2021, Dr. Pagent re-ordered orthopedic shoes for Mr. Renney because he still had

not received the orthopedic shoes first ordered for him by Dr. Galloti in March 2021. To date,

Mr. Renney has not received his orthopedic shoes.

95.

During the summer of 2021, Dr. Gulati left Limestone prison. He was replaced by Dr.

Blalock.

96.

In July or August 2021, Dr. Blacklock reviewed Mr. Renney's medical chart and knew

that Mr. Renney had a diabetic foot that was becoming increasingly infected and that Drs.

Russell or Bowman had recommended proceeding with surgery the "sooner the better" on April

8, 2021 and again on July 15, 2021.

97.

Instead of proceeding with the recommended surgery, Dr. Blalock caused further delay

and failed to immediately schedule Mr. Renney's surgery to amputate the tip of Mr. Renney's

left big toe.

98.

22

During this time, Mr. Renney continued to suffer in immense pain and periodically experienced high fevers as his left big toe became increasingly infected.

99.

In October 2021, Dr. Blalock insisted that Mr. Renney go to a different outside medical provider for another consult and sent Mr. Renney to Health Sports Med Orthopedic Surgery & Spine Center, 4715 Whitesburg Dr. in Huntsville, AL 35802. At Sports Med, Mr. Renney was seen by Dr. Sterling II.

100.

In October 2021, Dr. Sterling II again recommended surgery. But now, he said, the infection had worsened to the point where it was necessary for the entire left big toe to be amputated.

101.

On or around October 21, 2021, Mr. Renney underwent the surgical amputation of his left big toe at Crestwood Hospital, 1 Hospital Drive Southwest in Huntsville, AL 35801. The operation was performed by Dr. Sterling.

102.

If Defendant medical providers had promptly scheduled the surgery recommended by Drs. Russell or Bowman on April 8, 2021, instead of waiting six months until October 21, 2021, then Mr. Renney would only have needed to have the tip of his left big toe amputated instead of the entire left big toe. In addition, Mr. Renney would have been spared months of agonizing pain, continued infection in his left foot, and subsequent additional surgeries.

**E.  In February 2022, Mr. Renney injures his second toe; despite the obvious infection and need for amputation, Defendants do not take Mr. Renney for off-site consult with Dr. Sterling until May 10, 2022.**

103.

In February 2022, Mr. Renney tripped and ripped off the tip of his second toe on his left foot. Mr. Renney's foot was in an open-toed boot and he tripped while climbing stairs at

Limestone prison. In addition, there was continued infection from his left big toe. The already

existing infection spread to the new injury on his second toe.

104.

Defendant medical providers never provided Mr. Renney with a cane or orthopedic

shoes, despite Dr. Gulati first ordering orthopedic shoes for Mr. Renney in March 2021 and Dr.

Pagent re-ordering orthopedic shoes in July 2021. The failure by Defendant medical providers to

provide Mr. Renney with a cane and/or orthopedic shoes was a proximate cause of Mr. Renney

's fall and injury to his second toe on his left foot in February 2022.

105.

On February 22 and 23, 2022 Mr. Renney went to the medical unit and requested medical

treatment for his second toe. Mr. Renney went to the health care unit on February 22, 2022, from

12:05 to 1:00 p.m., February 23, 2022, from 8:00 a.m. to 3:30 p.m. Outside contractors came in

and performed an x-ray.

106.

The Defendant medical providers who saw Mr. Renney and personally observed his

second left toe on February 22 and 23, 2022 and on multiple occasions during the spring of 2022

were Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy,

and Nurse Miller.

107.

Even after his first big toe was amputated, it remained infected. Blood and pus leaked out

of the wound. The pus and infection from the first toe contributed to the infection of the second

toe.

108.

On February 22 and 23, 2022, Defendant medical providers Dr. Shala, Dr. Blalock, Dr.

Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller saw that Mr.

Renney's big left toe remained infected, knew that Mr. Renney recently suffered an amputation

on his toe to prevent the spread of a diabetic ulcer, and therefore knew that Mr. Renney remained at high risk of reoccurring infection.

109.

Mr. Renney's second toe disintegrated over the coming months and essentially rotted off. Pieces of bone continued to come out of his toe, ripping through skin. The skin and flesh rotted off until only the exposed bone remained for several weeks. Then the bone of his second toe also snapped off.

110.

Mr. Renney went to the health care unit on March 21, 2022, from 8:00 a.m. to 1:10 p.m., and March 25, 2022 from 8:00 a.m. to 5:00 p.m.

111.

On either March 21, 2022 or March 25, 2022, Mr. Renney showed his second toe on his left foot to Dr. Blalock, including the black and rotting flesh, the putrid smell, and the exposed bone. Dr. Blalock responded with "Ok, so?"

112.

Dr. Blalock reviewed Mr. Renney's medical records when meeting with him and knew that Mr. Renney had recently undergone an amputation for his left big toe and, as a diabetic, remained at risk for reoccurring infection. Based on the rotting flesh in Mr. Renney's second left toe, the standard of care required that Dr. Blalock treat Mr. Renney's second left toe with intravenous antibiotics.

113.

Soon after, Mr. Renney was given ten days of oral antibiotics. But this was insufficient compared to intravenous antibiotics to treat Mr. Renney's moderate to severe infection.

114.

During this time Mr. Renney often ran a fever as the infection continued to worsen in his second toe. Pus kept coming out of his second toe. Mr. Renney cleaned his toe daily in an

attempt to stop the infection by cleaning it with an antiseptic solution and applying bandages. He applied this treatment and bandages himself.

115.

From April 5, 2022 to April 18, 2022, Mr. Renney stayed in the Limestone health care unit. Mr. Renney went there because his second toe was disintegrating. Mr. Renney went there on April 5, 2022 with an inch of bone in his hand that had snapped off his second toe. The medical staff told him they would order a surgical consult to amputate the remainder of his second toe and admitted him to stay in the health care unit until the surgical consult was scheduled.

116.

While Mr. Renney stayed in the health care unit from April 5, 2022 to April 18, 2022 Defendant medical providers personally observed Mr. Renney's wound, read his medical records, knew that Mr. Renney needed immediate surgery, oral antibiotics, and/or intravenous antibiotics. These Defendant medical providers were Dr. Shala, Dr. Gulati, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller.

117.

Each morning, from April 5, 2022 to April 18, 2022, Defendant medical providers Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent, conducted medical rounds of those prisoners, including Mr. Renney, who were inside the health care unit. These Defendant medical providers personally observed Mr. Renney's infected second left toe, read his medical records, knew that Mr. Renney needed immediate surgery and/or intravenous antibiotics.

118.

Defendant medical provider nurses, Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller handed Mr. Renney bandages to change and dress his wound care on his own because they did not have time to change the

bandages with the number of inmates in the medical unit. Nurses laughed watching him hop around the medical unit. The medical unit was generally very filthy. Mr. Renney only saw the medical unit swept once during the time he spent there.

119.

Multiple inmates died in the medical unit while Mr. Renney was there. There are five-six prisoners in each of three "suicide" cells in the health care unit, intended to serve as a place for observation and treatment for inmates who have expressed suicidal ideation. Mr. Renney knew of several inmates who hanged themselves in those cells during 2022. Mr. Renney saw one inmate hang himself in a "suicide" cell during his thirteen-day April 2022 stay in the health care unit.

120.

Mr. Renney heard of several other inmates who died while he stayed in the medical unit. The deaths made a memorable impression on Mr. Renney because the bodies were placed in black body bags and then correctional officers ordered inmates to carry them out. An inmate named Mason, last name unknown, was sent back and forth from the hospital before eventually dying in the medical unit. Bobby, last name unknown, suffered five heart attacks over several days while in the medical unit and then died.

121.

Mr. Renney, despite hobbling on an infected foot, also helped other inmates while he was in the medical unit. One inmate, an eighty-year-old man, often defecated on himself. Mr. Renney cleaned the man because otherwise the man would spend hours sitting in his own waste and filth until medical staff cleaned him up.

122.

Mr. Renney observed that the health care unit was understaffed while he was there. Often there were only three nurses on duty for the entirety of Limestone correctional facility. One nurse

was stationed in the medical unit, one in lock-up, and one was on pill call duty, tasked with administering daily medication for 2,300 inmates, including diabetic and aging inmates.

123.

After he had been in the medical unit for about ten days, Mr. Renney grew frustrated and asked Dr. Evans why was he admitted to the health care unit if they were not providing any additional care for him.

124.

Dr. Evans told him that they were in the process of scheduling surgery for him. Mr. Renney told him that he could wait for surgery in his block and clean his wound there because he was not receiving any additional care in the health care unit.

125.

Throughout 2022, Defendant medical providers prescribed Mr. Renney ibuprofen or tylenol to control his fever, a symptom of his infected ulcer. When his medication ran out Mr. Renney would request more from the health care unit but would still go for stretches of two weeks or even a month without his prescribed medication while his fever continued.

126.

Mr. Renney put in multiple sick calls and grievances complaining about the difficulty of getting his prescribed medication to treat his fever and requesting either an outside consult or further surgery to remove his second toe.

127.

Of the multiple grievances Mr. Renney filed, the one he turned in on May 7, 2022 is the only received a response back once. That answer denied his request and was two months after he filed the grievance, on July 29, 2022.

128.

Mr. Renney once had copies of his other grievances but the CERT team came into his dorm and his paperwork got scattered.

129.

On May 10, 2022, Mr. Renney was finally taken back for a consult at Sports Med in Huntsville, Al. Dr. Sterling told him that the top two "knuckles" of the second toe needed to be amputated to prevent the spread of infection and the risk of osteomyelitis.

130.

Defendant medical providers Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller, originally ordered or knew of the May 10, 2022 consultation with Dr. Sterling and knew that he recommended surgery to amputate the two joints of the second toe.

131.

Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent, Nurse McElroy, and failed to promptly schedule Mr. Renney's surgery, despite it being recommended by Dr. Sterling, and failed to prescribe intravenous antibiotics for Mr. Renney, despite knowing that Mr. Renney suffered a moderate to severe diabetic ulcer on his second toe. In addition, while Nurse Miller and Nurse John Doe II did not have the authority on their own to order intravenous antibiotics and surgery, they failed to take any step to recommend these medical treatments.

132.

In May and June 2022, Mr. Renney's second toe became increasingly infected.

133.

On June 21, 2022, Nurse Colleen Oaks personally observed Mr. Renney's infected second toe on his left foot and was so alarmed at the state of the infection that she personally requested that Mr. Renney be taken to see Dr. Evans right away.

134.

On June 21, 2022, Nurse Colleen Oaks wrote a note to correctional officer Debbs stating: "This patient must see Dr. Evans now please thank you." (Emphasis in original).

135.

On June 21, 2022, Dr. Evans saw Mr. Renney's second toe and noted the obvious signs of advanced infection, but still did not order Mr. Renney's surgery or prescribe additional antibiotics.

136.

The surgery to amputate Mr. Renney's second toe was not scheduled until August 2022. In August 2022, Mr. Renney underwent a procedure at Crestwood Hospital in Huntsville, AL. There was nothing left in the places of his second toe to amputate as the flesh and bone of the second toe had rotted off by this point. Dr. Sterling sewed up the wound that remained at the top of his foot.

137.

Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller delayed after the May 10, 2022 and failed to promptly schedule Mr. Renney's surgery until August 2022 surgery. In addition, Dr. Shala, Dr. Blalock, Dr. Evans, and Dr. Pagent and Nurse John Doe II, Nurse McElroy, and Nurse Miller failed to prescribe intravenous antibiotics. These acts and omissions were a proximate cause of Mr. Renney losing his second toe and eventually all of his left toes and the first one inch of his left foot.

**F. September 2022, Mr. Renney receives intravenous antibiotics for the first and only time and undergoes his third surgery, losing the top inch of his left foot.**

138.

On September 15, 2022, Defendant medical providers administered intravenous antibiotics to Mr. Renney. This demonstrates that Defendant medical providers knew that the medial standard of care for treating a diabetic foot requires administration of intravenous antibiotics when an injury first fails to respond to oral antibiotics and had the capacity to administer intravenous antibiotics.

139.

30

On October 7, 2022, Mr. Renney had his third surgery performed at Crestwood Hospital, again by Dr. Sterling. Mr. Renney underwent an amputation of all the toes on his left foot and first inch of his left foot.

### G. Events since the last operation

140.

As a result of losing the top one of his left foot, Mr. Renney is currently in a wheelchair. There is a spot on the stump of his foot that is still healing. He continues to worry that the infection will spread up his left leg and poses a risk of him losing his entire left leg. He has to massage his lower leg to get blood flowing.

141.

To date Mr. Renney has not received his orthopedic shoes. The lack of orthopedic shoes poses a risk that once Mr. Renney begins attempting to walk he will re-injure his left foot, reopening his wound and delaying his recovery.

142.

Because of the loss of his toes on his left foot Mr. Renney is in a wheelchair and he sleeps on a cot in a dorm that houses hundreds of other inmates. Mr. Renney's physical injury makes him especially vulnerable to assault. He is concerned for his physical safety.

143.

Mr. Renney's concern for his physical safety is real. In August 2020, the DOJ documented that four prisoners were involved in a knife fight at Limestone that resulted in three being transported to an outside hospital. In December 2020, a prisoner was stabbed multiple times by another prisoner and had to be transported to an outside hospital. On June 16, 2022, Patrick Stinson was stabbed in the throat at and had to be transported to an outside hospital. In the summer of 2022, Vadarius Hall and Toby Davis were both victims of inmate-on-inmate assaults at Limestone. Quinton Miller-Ivory was the victim of an inmate-on-inmate assault on

July 30, 2022 and transported to an outside area hospital. James Kyle Tubbs was also a victim of inmate-on-inmate assault on August 1, 2022. On October 15, 2022, Kenyon Arrington was assaulted and killed. On January 6, 2023, Ariene Kimbrough was also stabbed and killed at Limestone.

144.

Mr. Renney's glucose levels have varied between 150 and 250 mg/dL. Mr. Renney finds it difficult to control his glucose levels because he receives so little food, the meals are often served at different times or he misses meals while waiting at pill call, and due to the poor nutritional quality of the food. When he first entered Limestone, Mr. Renney weighed 220 pounds. Due to the poor nutritional quality of the food he receives at Limestone, Mr. Renney's weight has dropped from 220 pounds to approximately 160 pounds.

145.

Mr. Renney will require continued care and assistance to treat his left foot for the remainder of his life.

146.

The loss of Mr. Renney's left toes and one inch of his left foot will severely limit Mr. Renney's mobility and ability to participate in physical activities for the remainder of his life. A big toe plays a critical role in foot biomechanics by supporting approximately around forty percent of body weight. Walking after the amputation of his left big toe will be extremely difficult for Mr. Renney. The loss of a big toe significantly alters Mr. Rnney's foot pressure distribution and, in diabetic patients like Mr. Renney, increases the risk of reoccurring injury, infection, and amputation.

147.

Prior to being incarcerated, Mr. Renney held a series of jobs, including working as a deckhand, serving in the military, and as a truck driver. While incarcerated, Mr. Renney has

completed numerous degree programs, including learning how to design electrical towers. If Mr.

Renney is ever released from ADOC he will be unable to use the training and job skills he

learned while in prison. The partial amputation of his foot will preclude him from these

positions. In addition, the partial amputation of Mr. Renney's foot will prevent him from gaining

meaningful employment in many other positions, such as a day laborer or even as a cook.

**CLAIMS FOR RELIEF**

**First Cause of Action: Inadequate Medical Care**
**Eighth Amendment**
**Against Medical Defendants Dr. Shala, Dr. Gulati, Dr. Pagent, Dr. Blalock, Dr. Evans,**
**Nurse McElory, Nurse Miller, Nurse John Doe II**

148.

Plaintiff reasserts and incorporates by reference the allegations contained in Paragraphs

1-147 above.

149.

The Defendant medical providers, through their actions and omissions described herein,

subjected Plaintiff to a substantial risk of serious harm and injury from inadequate medical care

in violation of 42 U.S.C. § 1983 and the Eighth Amendment to the U.S. Constitution. The

Defendant medical providers acted under color of state law and are the proximate cause of

Plaintiff's ongoing deprivation of rights secured by the United States Constitution under the

Eighth Amendment.

150.

Defendant Dr. Shala failed to prescribe intravenous antibiotics and failed to promptly

schedule Mr. Renney's surgery, from April 8, 2021 until October 21, 2021. Dr. Shala also failed

to prescribe intravenous antibiotics after observing Mr. Renney's second left toe on February 22

or 23, 2021, or to prescribe intravenous antibiotics or promptly schedule Mr. Renney's surgery

33

anytime after April 18, 2022 until Mr. Renney's August 2022 surgery. These acts and omissions proximately caused Mr. Renney further infection, pain and suffering, two unnecessary surgical procedures, and the loss of all of his toes and the top inch of his left foot.

151.

Defendant Dr. Gulati failed to prescribe oral antibiotics, intravenous antibiotics, and failed to schedule Mr. Renney's surgery, from April 8, 2021 until Dr. Gulati left Limestone in the summer of 2021. These acts and omissions proximately caused Mr. Renney further infection, pain and suffering, two unnecessary surgical procedures, and the loss of all of his left toes and the top inch of his left foot.

152.

Defendant Dr. Blalock failed to prescribe oral antibiotics, intravenous antibiotics, or promptly schedule the surgery twice recommended by Drs. Russell and Bowman after observing Mr. Renney's big left toe in July or August 2021. Dr. Blalock delayed scheduling the surgery until October 2021. In March 2022, Dr. Blalock failed to prescribe oral intravenous antibiotics, or promptly schedule a surgical consult for Mr. Renney after personally observing his rotting second left toe and exposed bone, instead responding with an indifferent "Ok, so?" Dr. Blalock failed to prescribe intravenous antibiotics or promptly schedule Mr. Renney's surgery after April 18, 2022 until Mr. Renney's August 2022 surgery. These acts and omissions proximately caused Mr. Renney further infection, pain and suffering, two unnecessary surgical procedures, and the loss of the top inch of his left foot.

153.

Defendant Dr. Evans failed to prescribe intravenous antibiotics after observing Mr. Renney's second left toe on February 22 or 23, 2021, and failed to prescribe intravenous antibiotics or promptly schedule Mr. Renney's surgery after April 18, 2022 including on June 21,

2022, until Mr. Renney's August 2022 surgery. These acts and omissions proximately caused Mr. Renney further infection, pain and suffering, two unnecessary surgical procedures, and the loss of the top inch of his left foot.

154.

Defendants Nurse McElroy, Nurse John Doe II, and Nurse Miller failed to prescribe intravenous antibiotics after observing Mr. Renney's second left toe on February 22 or 23, 2021, and failed to prescribe intravenous antibiotics, or promptly schedule Mr. Renney's surgery after April 18, 2022, until Mr. Renney's August 2022 surgery. Alternatively, they failed to take any steps to initiate administering intravenous antibiotics or recommend a surgical consult. These acts and omissions proximately caused Mr. Renney further infection, pain and suffering, two unnecessary surgical procedures, and the loss of the top inch of his left foot.

**Second Cause of Action: Inadequate Medical Care**
**Eighth Amendment**
**Against Defendants Hamm, Dunn, Naglich, Warden Crabtree, Warden John Doe I,**
**Warden Toney**

155.

Plaintiff reasserts and incorporates by reference the allegations contained in Paragraphs 1-147 above.

156.

At all relevant times, Defendants Hamm, Dunn, Naglich, Warden Crabtree, Warden John Doe I, and Warden Toney, through their agents, employees, and/or officers, were acting pursuant to an expressly adopted policy or a longstanding practice of custom.

157.

At all relevant times, Defendants Hamm, Dunn, Naglich, Warden Crabtree, Warden John Doe I, and Warden Toney, subjected Mr. Renney to deprivation of his rights in violation of the

Eighth Amendment to the United States Constitution by engaging in the following policies,

practices, and customs:

   a. Failing to adequately staff Limestone with medical providers and correctional officers, resulting in a failure to provide treatment to prisoners suffering from diabetes, like Mr. Renney,
   b. Failing to provide treatment to prisoners suffering from diabetic foot ulcers, like Mr. Renney, including access to intravenous antibiotics
   c. Failing to provide prompt referrals to outside podiatrists or surgical consults to schedule surgery for prisoners suffering from diabetic foot ulcers, like Mr. Renney
   d. Failing to provide access to orthopedic footwear to facilitate appropriate healing and rehabilitation in prisoners suffering from diabetic foot ulcers, like Mr. Renney.

158.

At all relevant times, Defendants Hamm, Dunn, Naglich, Warden Crabtree, Warden John

Doe I, and Warden Toney, were aware of the risk of serious harm to diabetic prisoners, including

Mr. Renney, resulting from the aforementioned policies.

159.

Such Defendants also acted with deliberate indifference to the foreseeable effects and

consequences of these policies with respect to the constitutional rights of Mr. Renney.

160.

As a direct and proximate result of the Constitutional violations caused by Defendants

Hamm, Dunn, Naglich, Warden Crabtree, Warden John Doe I, and Warden Toney, the

employees, agents, and/or officers of ADOC, Wexford, and Limestone inflicted injuries on Mr.

Renney.

161.

As a direct and proximate result of the Constitutional violations caused by Defendants

Hamm, Dunn, Naglich, Warden Crabtree, Warden John Doe I, and Warden Toney, the

employees, agents, and/or officers of ADOC, Wexford, and Limestone inflicted injuries on Mr.

Renney.

36

**Third Cause of Action: Inadequate Medical Care**
**Eighth Amendment**
**Against Defendant Wexford**

162.

Plaintiff reasserts and incorporates by reference the allegations contained in Paragraphs 1-147 above.

163.

At all relevant times, Defendant Wexford administered, referred, and approved medical care for prisoners at Limestone Correctional facility.

164.

At all relevant times, Defendant Wexford, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

165.

At all relevant times, Defendant Wexford, had in effect official policies or longstanding practices or customs that condoned and fostered the unconstitutional conduct of the agents and employees of Wexford and/or Limestone, including:

a. Failing to adequately staff Limestone with medical providers and correctional officers, resulting in a failure to provide treatment to prisoners suffering from diabetes, like Mr. Renney,
b. Failing to provide treatment to prisoners suffering from diabetic foot ulcers, like Mr. Renney, including access to intravenous antibiotics
c. Failing to provide prompt referrals to outside podiatrists or surgical consults to schedule surgery for prisoners suffering from diabetic foot ulcers, like Mr. Renney
d. Failing to provide access to orthopedic footwear to facilitate appropriate healing and rehabilitation in prisoners suffering from diabetic foot ulcers, like Mr. Renney.

166.

At all relevant times, Defendant Wexford failed to properly train or supervise its agents and employee on the provision of needed treatment for diabetic prisoners.

167.

37

Defendant had actual and/or constructive knowledge of the deficient policies, practices, and customs alleged above. Despite having knowledge of the above, the Defendant condoned, tolerated, and through its own actions or inactions thereby ratified such policies.

168.

The acts or omissions of Defendant as described herein deprived Mr. Renney of his constitutional rights and caused him to suffer other damages.

### Fourth Cause of Action: Violation of the Rights of Prisoners with Disabilities Americans with Disabilities and § 504 of the Rehabilitation Act of 1973 Against Defendants ADOC and Wexford

169.

Plaintiff reasserts and incorporates by reference the allegations contained in Paragraphs 1-147 above.

170.

As an individual with diabetes, Mr. Renney is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Mr. Renney is being denied adequate medical care, and reasonable accommodations for his disabilities under the ADA and § 504.

171.

Defendants ADOC and Wexford subjected Mr. Renney to regular and systemic discrimination based on his disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Defendants ADOC and Wexford and their agents, officials, employees, and all persons acting in concert with ADOC and Wexford under color of state law, in their official capacities, are the proximate cause of Mr. Renney's ongoing deprivation of rights secured by federal law.

172.

ADOC and Wexford's deliberate refusal to accommodate Mr. Renney's disability-related needs for medical care constitutes exclusion from participation in denial of the benefits of Limestone's "services, programs, or activities." 42 U.S.C. § 12132.

173.

The denial of Mr. Renney's needs for medical care include (1) failing to ensure that Mr. Renney received orthopedic shoes; (2) failing to ensure that Mr. Renney received adequate nutrition, which in turn adversely effected his glucose levels, preventing his wounds from healing and from fighting off infection; and (3) regular access to his prescribed pain medication.

172.

Defendants ADOC and Wexford have been and are aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Fifth Cause of Action: Medical Malpractice**
**Against Medical Defendants Dr. Shala, Dr. Gulati, Dr. Pagent, Dr. Blalock, Dr. Evans,**
**Nurse John Doe II, Nurse McElroy, and Nurse Miller**

173.

Plaintiff reasserts and incorporates by reference the allegations contained in Paragraphs 1-147 above and allegations set forth in support of Count I above.

174.

Defendants owed a duty to Mr. Renney to treat him under the prevailing standard of care for a person who suffered from a diabetic foot described in this Complaint, including by prescribing intravenous antibiotics, promptly scheduling Mr. Renney's surgery, and providing him with his prescribed orthopedic footwear. As more fully set forth in Count I, Defendants violated the prevailing standard of care owed to Mr. Renney and as a result of Defendants' acts or omissions, Mr. Renney suffered extreme pain, suffering, and injury, including a partial amputation of his left foot. Mr. Renney suffers every day from the psychological trauma that comes with watching these medical providers stand by and watch Mr. Renney lose his left foot

while he implored them to help him, and while they had actual knowledge that he needed surgery

the "sooner the better."

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Mr. Joseph Renney, prays for a trial by jury and judgment

against one or more Defendants, individually or jointly for the following:

(a)     That process, issue, and service be had on each Defendant;
(b)     Compensatory damages as allowed by law;
(c)     Special damages, as more particularly shown at trial;
(d)     Damages for injuries caused by deprivation of Constitutional rights under the United States Constitution and other federal rights;
(e)     Punitive damages against each Defendant;
(f)     Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C § 1988;
(g)     Any other and further relief so ordered.

Respectfully submitted this 21ST day of March 2023,

/s/Richard A. Rice
Richard A. Rice
 The Rice Firm, LLC
N. 115 Richard Arrington Jr. Blvd.
Birmingham, AL 35203
rrice@rice-lawfirm.com
205-618-8733
AL Bar No. 8387I66R

/s/ *Andrew Menefee*
Andrew Menefee
LAW OFFICE OF JOHN BATSON
Georgia Bar No. 404627
*Pro hac vice* forthcoming
P.O. Box 3248
1104 Milledge Road
Augusta, GA 30914
(phone) 706-737-4040
(fax) 706-736-3391
amenefee03@gmail.com