FILED
2024 Sep-13  AM 09:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH ALLEN RENNEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:23-cv-00361-MHH** |
| | } | |
| **ALABAMA DEPARTMENT OF** | } | |
| **CORRECTIONS, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, several of the defendants in this case have asked the Court to dismiss plaintiff Joseph Renney's claims against them.  Mr. Renney alleges that while he was incarcerated at Limestone Correctional Facility, he did not receive constitutionally adequate medical treatment for his diabetic foot infections and that the constitutionally deficient medical treatment caused him to undergo three amputations and lose his left toes and part of his left foot.  Pursuant to § 1983, Mr. Renney asserts Eighth Amendment deliberate indifference claims against state-level supervisory officials from the Alabama Department of Corrections in their individual capacities, supervisory officials from Limestone Correctional Facility, the contract healthcare provider for inmates at Limestone, and medical professionals involved in his care.  (Doc. 76, pp. 4-5, 34-

39).[1]  Mr. Renney also asserts claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act against ADOC and the contract healthcare provider and state law malpractice claims against the medical professionals.  (Doc. 76, pp. 39-41).

In their motions to dismiss, the ADOC defendants and the Limestone Correctional defendants assert that Mr. Renney has not stated a claim against them under § 1983, in part because they are immune from Mr. Renney's § 1983 claim.

---

[1]  The supervisory defendants are John Hamm, the current Commissioner of ADOC, and his predecessor Jeff Dunn; Ruth Naglich, who was the Associate Commissioner of Health Services at ADOC until March 2021 when she retired; and Chadwick Crabtree, the current Warden of the Limestone Correctional Facility, and his predecessor Deborah Toney.  (Doc. 76, pp. 4-6, ¶¶ 11-16).

Wexford Health Services, Inc. provides healthcare to inmates at Limestone Correctional Facility.  (Doc. 76, pp. 4-9, ¶¶ 10-26).

In his amended complaint, Mr. Renney did not provide the first names of the medical defendants who were involved in his medical care at Limestone Correctional Facility.  In their responsive pleadings, the medical defendants provided their complete names and medical titles.  The medical defendants are Dr. Milton Padgett, Dr. Prem Gulati, Dr. Jeana Blalock, and Dr. Don Evans; certified registered nurse practitioner Shahla Poursaied; and registered nurses Taylor McElroy and Angel Miller.  (Doc. 35; Doc. 51; Doc. 53; Doc. 55; Doc. 64; Doc. 72; Doc. 76, pp. 6-9, ¶¶19-23, ¶¶ 24-25; Doc. 77).  In his amended complaint, Mr. Renney incorrectly refers to CRNP Shahla Poursaied as "Dr. Shala."  (Doc. 76).  The Court will refer to CRNP Poursaied in this opinion.

Mr. Renney asserts claims against two fictitious defendants, "Warden John Doe I" and "Nurse John Doe II."  (Doc. 76, pp. 5, 9, ¶¶ 15, 26).  The named defendants have not asked the Court to dismiss the fictitious defendants.  "As a general matter, fictitious-party pleading is not permitted in federal court."  *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010).   The Eleventh Circuit has "created a limited exception to this rule when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'"  *Richardson*, 598 F.3d at 738 (quoting *Dean v. Barber,* 951 F.2d 1210, 1215–16 (11th Cir. 1992)).  Mr. Renney's descriptions of the fictitious defendants are not specific enough to satisfy the exception.  Therefore, the Court will dismiss his claims against the fictitious defendants without prejudice.

(Docs. 16; 17, 38, 39).[2]  ADOC also argues that Mr. Renney's ADA and Rehabilitation Act claims fail because he has not stated a claim for monetary damages.  (Doc. 20, p. 1).  Dr. Padgett asks the Court to dismiss Mr. Renney's § 1983 deliberate indifference and state law medical malpractice claims against him for failure to state a claim.  In the alternative, Dr. Padgett asks the Court to order Mr. Renney to provide a more definite statement of those claims.  (Docs. 70, 78).[3]

---

[2]  The supervisory defendants and ADOC filed motions to dismiss Mr. Renney's initial complaint. (Docs. 1, 16-17, 20, 38, 39).  Supervisory defendants Hamm, Dunn, Naglich, and Crabtree joined in the motion to dismiss, (Docs. 16, 17), and defendant Toney filed an identical, separate motion to dismiss, (Docs. 38, 39).  ADOC filed a separate motion to dismiss, (Doc. 20).  Mr. Renney filed an amended complaint that included allegations against the supervisory defendants and ADOC identical to the allegations in his original complaint.  In the amended complaint, Mr. Renney changed only paragraph 154 concerning Dr. Padgett.  (Doc. 76, p. 1; *compare* Doc. 1 with Doc. 76).  Mr. Renney's amended complaint did not moot the defendants' arguments in their motions to dismiss.  Therefore, the Court will regard the motions to dismiss as directed to the amended complaint, (Doc. 76), and resolve them.

On April 4, 2024, Mr. Renney filed a motion for leave to file a second amended complaint, (Doc. 83).  If allowed, the second amended complaint would add as defendants two medical professionals who treated Mr. Renney at Limestone.  (*See* Doc. 83-1, pp1-2).  Because the Court has spent considerable time on the motions to dismiss the first amended complaint, and because the second amended complaint does not change Mr. Renney's allegations against the supervisory defendants and would not moot the supervisory defendants' arguments in their motions to dismiss, the Court will resolve the motions to dismiss based on Mr. Renney's allegations in the first amended complaint before addressing Mr. Renney's motion for leave to amend his complaint.

[3]  Dr. Padgett filed a motion to dismiss Mr. Renney's initial complaint.  (Doc. 70).  Mr. Renney amended his complaint and changed paragraph 154 concerning Dr. Padgett.  (Doc. 76, pp. 1, 36). Dr. Padgett answered the amended complaint, (Doc. 77), and then, a few minutes later, moved to dismiss the amended complaint, (Doc. 78).  In his motion to dismiss, Dr. Padgett adopted and incorporated by reference his arguments in his first motion to dismiss, (Doc. 78, p. 2).  In his response to Dr. Padgett's motion to dismiss the amended complaint, Mr. Renney did not argue that Dr. Padgett's motion to dismiss filed after his answer was procedurally improper.

As discussed above in footnote 2, Mr. Renney has filed a motion for leave to file a second amended complaint, (Doc. 83).  If allowed, the second amended complaint would not moot Dr. Padgett's arguments in his motion to dismiss the first amended complaint.  Therefore, the Court will resolve Dr. Padgett's motion to dismiss Mr. Renney's claims against him in the first amended complaint

To resolve these motions, the Court first sets forth the standard for motions to dismiss under Rule 12(b)(6).  Then, the Court describes the factual allegations in Mr. Renney's amended complaint and information incorporated into the complaint by reference.  Consistent with the standard for motions to dismiss, the Court presents Mr. Renney's factual allegations in the light most favorable to him.  Finally, the Court evaluates Mr. Renney's factual allegations and the information incorporated in the complaint by reference under the legal standards that govern the defendants' arguments for dismissal.

## I.

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet the pleading requirement of Rule 8(a)(2) and survive a Rule 12(b)(6) challenge, a plaintiff does not have to include in a complaint "detailed factual allegations," but a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

---

before addressing Mr. Renney's motion for permission to file a second amended complaint.

(quoting *Twombly*, 550 U.S. at 555).

In deciding a Rule 12(b)(6) motion to dismiss, a district court must view the factual allegations in the complaint in the light most favorable to the plaintiff and accept the alleged facts as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A district court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,* 551 U.S. at 322; *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim," a district court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal . . . .").

## II.

### *Allegations regarding inadequate medical care*

The factual allegations in the complaint, viewed in the light most favorable to Mr. Renney, indicate that he was an inmate at Limestone Correctional Facility in 2021 and 2022. (Doc. 76, p. 2, ¶ 2).[4] Mr. Renney has diabetes. (Doc. 76, p. 2, ¶ 2).

---

[4] The Alabama Department of Corrections' website indicates that Mr. Renney first was incarcerated at Limestone in 2009. *See* https://doc.alabama.gov/InmateHistory (last visited May 13, 2024).

On March 12, 2021, Mr. Renney broke his left big toe.  (Doc. 76, pp. 2, 19, ¶¶ 2, 71).  Mr. Renney "was given gauze to clean the wound on his left big toe" and wrap his toe "for about seven days."  (Doc. 76, p. 19, ¶ 73).  In March 2021, Dr. Gulati, one of the physicians at Limestone Correctional, ordered orthopedic shoes for Mr. Renney to help him walk and to help his broken toe heal, but Mr. Renney did not receive the shoes.  (Doc. 76, p. 19, ¶ 74).  Mr. Renney's toe "quickly became infected."  (Doc. 76, p. 2, ¶ 2).

During an April 8, 2021 consultation at Podiatry Associates, the podiatrist who examined Mr. Renney noted that Mr. Renney had Type 2 diabetes and an "ulceration on his left big toe."  (Doc. 76, p. 19, ¶ 76).  The podiatrist recommended amputation of the tip of Mr. Renney's left big toe, "up to the first metatarsophalangeal joint," to prevent the spread of infection.  (Doc. 76, p. 19, ¶ 75).  The podiatrist indicated that surgery should be performed "in the near future," and "the sooner the better."  (Doc. 76, p. 20, ¶ 78).  The podiatrist gave his written recommendation to the correctional officer who accompanied Mr. Renney to the appointment.  (Doc. 76, p. 20, ¶ 79).

Between April 8, 2021 and July 2021, Mr. Renney went to the Limestone Correctional health care unit at least three times to ask to have his left toe wound cleaned.  During these visits, Mr. Renney saw Dr. Gulati, CRNP Poursaied, Nurse Lamb, and Nurse Bunn.  (Doc. 76, p. 20, ¶ 80).  During these visits, Dr. Gulati, CRNP Poursaied, Nurse Lamb, and Nurse Bunn reviewed Mr. Renney's medical

records and knew that the podiatrist had recommended that Mr. Renney undergo surgery quickly to prevent the spread of infection.  (Doc. 76, pp. 20-21, ¶ 83).  Dr. Gulati and CRNP Poursaied observed that Mr. Renney's left big toe was not healing but instead was becoming more infected, turning black, and oozing pus and blood. Still, the only treatment Mr. Renney received was the cleaning and bandaging of his wound.  (Doc. 76, pp. 20-21, ¶¶ 83, 87).  Mr. Renney asserts that he should have received intravenous antibiotics and should have undergone surgery, (Doc. 76, p. 21, ¶¶ 84, 86), and that the infection in his left toe caused him to run a fever, (Doc. 76, p. 21, ¶ 88).

As of July 2021, Mr. Renney still had not been scheduled for surgery. Concerned about the spread of infection, Mr. Renney contacted Mark Williams, an attorney with the United States Department of Justice who was involved in an investigation of Alabama's prisons.  (Doc. 76, p. 22, ¶ 89).  On July 15, 2021, Mr. Renney returned to Podiatry Associates.  A correctional guard who accompanied Mr. Renney stated that Mr. Renney needed another consultation.  (Doc. 76, p. 22, ¶ 92).  The podiatrist who Mr. Renney saw informed the guard that Mr. Renney "needed surgery immediately."  (Doc. 76, p. 22, ¶ 92).  Mr. Renney signed a consent form for surgery.  (Doc. 76, p. 22, ¶ 93).

Also in July 2021, Dr. Padgett, another physician at Limestone Correctional who treated Mr. Renney, ordered orthopedic shoes for him, but Mr. Renney did not

receive the shoes.  (Doc. 76, pp. 7, 23, ¶¶ 21, 94).

In July or August 2021, Dr. Blalock replaced Dr. Gulati at Limestone Correctional.  Dr. Blalock reviewed Mr. Renney's medical chart and learned that Mr. Renney has diabetes and was suffering from an infected foot for which surgery was recommended.  (Doc. 76, p. 23, ¶ 96).  Dr. Blalock had Mr. Renney see Dr. Sterling at Health Sports Med Orthopedic Surgery & Spine Center in Huntsville for another consultation.  (Doc. 76, p. 23, ¶ 99).  Mr. Renney did not see Dr. Sterling until October 2021, and Mr. Renney "suffer[ed] in immense pain and periodically experienced high fevers" while he waited to see Dr. Sterling.  (Doc. 76, p. 23, ¶¶ 98-99).  Dr. Sterling confirmed that Mr. Renney needed surgery, but, because the infection in Mr. Renney's toe was worse, Dr. Sterling recommended amputation of Mr. Renney's entire left big toe.  (Doc. 76, p. 24, ¶ 100).  On October 21, 2021, Dr. Sterling surgically amputated Mr. Renney's left big toe.  (Doc. 76, p. 24, ¶ 101).

In February 2022, while wearing an "open-toed boot," Mr. Renney tripped and injured the second toe on his left foot.  (Doc. 76, p. 24, ¶ 103).  His left big toe still was infected, and the infection spread to his second toe.  (Doc. 76, pp. 24-25, ¶¶ 103, 107).  Outside medical contractors x-rayed Mr. Renney's injured toe, and Drs. Shala, Blalock, Evans, and Padgett examined his toe as did Nurses McElroy and Miller.  (Doc. 76, p. 25, ¶¶ 105-06).  These doctors and nurses knew about Mr. Renney's amputation and his infection and were aware that he "remained at high

risk of reoccurring infection." (Doc. 76, p. 25, ¶ 108).

On March 21 and 25, 2022, Dr. Blalock saw Mr. Renney's infected second toe. (Doc. 76, p. 26, ¶ 111). Dr. Blalock prescribed a 10-day course of oral antibiotics. (Doc. 76, p. 26, ¶ 113). The antibiotics did not resolve Mr. Renney's infection.

From April 5, 2022 until April 18, 2022, Mr. Renney stayed in the Limestone health care unit awaiting a surgical consult for his second toe because that toe was "disintegrating." (Doc. 76, p. 26, ¶ 115). During this time, several medical personnel including CRNP Poursaied, Dr. Evans, Dr. Padgett, Dr. Blalock, Nurse McElroy, and Nurse Miller conducted medical rounds and "observed Mr. Renney's wound, read his medical records, and knew that Mr. Renney needed immediate surgery, oral antibiotics, and/or intravenous antibiotics." (Doc. 76, p. 27, ¶¶ 116-17).[5] Because the health care unit was understaffed, Mr. Renney had to change his bandages and care for his wounds himself. (Doc. 76, pp. 27-28, ¶¶ 118, 122). "Often there were only three nurses on duty for the entirety of Limestone correctional facility," one nurse in the medical unit, one in lock up, and one on pill call duty. The pill call nurse was "tasked with administering daily medication for 2,300 inmates, including diabetics and aging inmates." (Doc. 76, p. 27, ¶ 122).

---

[5] Mr. Renney includes Dr. Gulati in the list of personnel who saw him in April 2022, but he also alleged that Dr. Blalock replaced Dr. Gulati at Limestone in July or August 2021. (Doc. 76, pp. 23, 27, ¶¶ 96, 116).

After about ten days in the health care unit, Mr. Renney expressed frustration to Dr. Evans about the delay in treatment.  (Doc. 76, p. 29, ¶ 123).  Mr. Renney asserts that Dr. Evans told him that "they were in the process of scheduling surgery for him." (Doc. 76, p. 29, ¶ 124).

During 2022, medical providers prescribed only ibuprofen or Tylenol to Mr. Renney to control the fevers he had because of his infection, and when he ran out, he would go for weeks without medication to control his fever.  (Doc. 76, p. 29, ¶ 125).  Mr. Renney alleges that he submitted multiple grievances concerning "the difficulty of getting his prescribed medication to treat his fever and requesting either an outside consult or further surgery to remove his second toe," but he received a response only to his May 7, 2022 grievance, and that response arrived on July 29, 2022.  (Doc. 76, p. 29, ¶¶ 126-27).

A few days after he submitted his May 7, 2022 grievance, Mr. Renney saw Dr. Sterling, and Dr. Sterling "told him that the top two 'knuckles' of the second toe needed to be amputated to prevent the spread of infection and the risk of osteomyelitis."  (Doc. 76, p. 30, ¶ 129).  CRNP Poursaied, Dr. Blalock, Dr. Evans, Dr. Padgett, Nurse McElroy, and Nurse Miller knew of Dr. Sterling's May 10, 2022 surgery recommendation.  (Doc. 76, p. 30, ¶ 130).

In May and June 2022, Mr. Renney's second toe on his left foot became more infected.  (Doc. 76, p. 30, ¶ 132).  On June 21, 2022, Nurse Oaks "was so alarmed

at the state of the infection that she personally requested that Mr. Renney be taken to see Dr. Evans right away." (Doc. 76, p. 30, ¶ 133). Dr. Evans "noted the obvious signs of advanced infection but still did not order Mr. Renney's surgery or prescribe additional antibiotics." (Doc. 76, pp. 30-31, ¶ 135).

In August 2022, Dr. Sterling performed surgery on Mr. Renney's second toe on his left foot, but there was "nothing left in the place[] of his second toe to amputate as the flesh and bone of the second toe had rotted off by this point," so Dr. Sterling "sewed up the wound that remained at the top of his foot." (Doc. 76, p. 31, ¶ 136). On September 15, 2022, the defendant medical providers administered intravenous antibiotics to Mr. Renney, but on October 7, 2022, Dr. Sterling had to amputate "all of the toes on [Mr. Renney's] left foot and [the] first inch of his left foot" because of infection. (Doc. 76, pp. 31-32, ¶¶ 138-39).

Mr. Renney eventually had to use a wheelchair because the amputations made it difficult for him to walk. (Doc. 76, p. 32, ¶ 140). After his last surgery, Mr. Renney worried that the infection in his left foot would spread and that he would lose his "entire left leg." (Doc. 76, p. 32, ¶ 140). Mr. Renney's physical condition makes him "especially vulnerable to assault," and he is "concerned for his physical safety." (Doc. 76, p. 32, ¶ 142).

*Allegations regarding supervisory liability*

Mr. Renney alleges that Wexford Health Services contracted with the

Alabama Department of Corrections to "administer, refer, and approve medical care and treatment for prisoners" at Limestone.  (Doc. 76, p. 6, ¶ 18).  According to Mr. Renney, ADOC Commissioners Dunn and Hamm oversaw ADOC's "vital functions, including prisoner medical treatment," (Doc. 76, p. 11, ¶ 34), and Ms. Naglich was "responsible for overseeing the provision of medical care to prisoners," including oversight of Wexford's work under its contract with ADOC, (Doc. 76, p. 11, ¶¶ 35, 37).  ADOC's Office of Health Services to which Ms. Naglich was assigned had "access to Wexford's internal documents and records, and Wexford was obligated to send reports, like monthly operating reports and annual compliance reports, to the OHS." (Doc. 76, p. 11, ¶¶ 35, 36).  Within the Limestone Correctional facility, Wardens Crabtree and Toney were responsible for the "safe, secure, and humane treatment of all prisoners incarcerated there."  (Doc. 76, pp. 5-6, ¶¶ 14, 16).

Mr. Renney asserts that the medical issues that led to the amputations on his left foot occurred while ADOC and the Limestone Correctional Facility were subject to the consent decree in *Braggs v. Dunn*, a prisoner class action in the Middle District of Alabama.  *Braggs v. Dunn*, 2:14-cv-601-MHT.  Some of the plaintiffs in *Braggs* alleged that they were members of an ADA subclass that included more than 1,300 prisoners in ADOC custody "who [were] enrolled in the diabetes chronic care clinic. . . ." *Braggs*, 2:14-cv-601, Doc. 805, p. 132).

The *Bragg* plaintiffs named ADOC, Commissioner Dunn, and Ms. Naglich as

defendants.[6]  The September 9, 2016 consent decree in *Braggs* concerns care and accommodations for prisoners with physical disabilities.  *Braggs*, 2:14-cv-601-MHT, Doc. 728.[7]

The September 9, 2016 consent decree addressed ADA and Rehabilitation Act claims related to physical disabilities of "'any current or future inmate in the physical custody of the Alabama Department of Corrections.'" (Doc. 76, pp. 14-15, ¶ 54) (quoting *Braggs*, 2:14-cv-601, Doc. 727, p. 6; Doc. 728, p. 11).  The decree's provisions are "designed to provide for care, services, accommodations, programs, and activities" for disabled inmates.  *Braggs*, 2:14-cv-601, Doc. 728, p. 11.  Under the consent decree, ADOC medical professionals must "screen, evaluate, and test [i]nmates for physical, mental, or intellectual disabilities at the time of initial intake" and "continue to periodically screen, evaluate[,] and test [i]nmates for disabilities while . . . in ADOC's custody to ensure that any change in an [i]nmate's disability status is identified, treated, and accommodated."  *Braggs*, 2:14-cv-601, Doc. 728,

---

[6]  In January 2022, Judge Thompson substituted Commissioner Hamm for Commissioner Dunn as a defendant in the *Braggs* litigation.  *Braggs*, 2:14-cv-601, Doc. 3476.

[7]  The September 9, 2016 consent decree appears as Attachment 1 to this opinion.  The Court takes judicial notice of the terms of the consent decree.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999) ("Fed. R. Evid. 201(b) provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. Appx. 52, 53-54 (11th Cir. 2006) (holding that a "district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. Public records are among the permissible facts that a district court may consider.") (citations omitted).

pp. 27-28, 32.

Under the consent decree, ADOC must document the results of medical examinations of prisoners with physical disabilities performed while the inmate is in ADOC custody. *Braggs*, 2:14-cv-601, Doc. 728, p. 32. "[A]s a result of the September 9, 2016 *Braggs* consent decree, Defendants ADOC, Hamm, Dunn, Naglich, and Wexford implemented a computerized system identifying and tracking those prisoners with disabilities and the accommodations the prisoners require. The information from this system is produced as a "Special Needs report." (Doc. 76, p. 17, ¶ 66). The consent decree labels as the "Computer Module" the electronic means of collecting and storing a physically disabled inmate's medical information. *Braggs*, 2:14-cv-601, Doc. 728, p. 32. The consent decree provides that the "health services contractor retained by ADOC" must "maintain the Module and update information contained therein related to [i]nmate disabilities or accommodation." *Braggs*, 2:14-cv-601, Doc. 728, p. 33. Updates must be complete within three business days of an "evaluation, screening, testing[,] and examination[]" performed on an inmate. *Braggs*, 2:14-cv-601, Doc. 728, p. 32.

The *Braggs* consent decree states that medical information collected about a prisoner with a physical disability "will be provided to ADOC personnel and contractors of ADOC consistent with the provisions of HIPAA," and the consent decree obligates ADOC to track inmates "who have been identified as having a

14

disability and any accommodations for such disability to ensure that [i]nmates receive appropriate care and accommodations for disability." *Braggs*, 2:14-cv-601, Doc. 728, p. 33. Under the consent decree, ADOC must use the Module "to track the care and any accommodations for [i]nmates with disabilities that are directed or ordered by ADOC's medical . . . providers." *Braggs*, 2:14-cv-601, Doc. 728, p. 33. When an inmate's "existing disability has materially changed," ADOC must "take all necessary steps to determine whether, and to what extent, that disability may be reasonably accommodated." *Braggs*, 2:14-cv-601, Doc. 728, p. 34.

Under the consent decree, ADOC must implement a quality assurance program to assess compliance with the consent decree. *Braggs*, 2:14-cv-601, Doc. 728, p. 58. "ADOC, Hamm, Dunn, Naglich, and Wexford reviewed monthly reports listing prisoner details and major surgical procedures, including deaths and amputations of diabetic prisoners," and these reports put these defendants on notice "that medical treatment for diabetic prisoners remain[ed] inadequate across all [ADOC] facilities and Limestone." (Doc. 76, pp. 17-18, ¶¶ 63-64, 67). Wardens Crabtree and Toney "had the authority to access the Special Needs report or did access the Special Need report, listing diabetic prisoners under their custody and their needed accommodations" and "had the authority to order the provision of appropriate treatment to diabetic prisoners in their custody." (Doc. 76, p. 18, ¶¶ 68-69).

Wardens Crabtree and Toney "were aware of the correctional officer and medical understaffing at Limestone" and the impact these staffing shortages had on the medical treatment of diabetic prisoners at Limestone.  (Doc. 76, p. 18, ¶ 68).  While he received treatment in the Limestone healthcare unit in 2021 and 2022, Mr. Renney observed that the number of medical personnel at Limestone was "far below the number allocated for Limestone" in Wexford's contract with ADOC.  (Doc. 76, pp. 12-13, ¶¶ 44-45).  According to Mr. Renney, the "combination of overcrowding and understaffing taxed Wexford's, ADOC's, and Limestone's ability . . . to monitor patients suffering severe and progressing infections," and reduced the defendants' "ability to make referrals to outside specialists."  (Doc. 76, p. 13, ¶ 46).

### III.

*The Supervisory Defendants' Motion to Dismiss*

The supervisory defendants argue that the Court should dismiss Mr. Renney's § 1983 deliberate indifference to medical needs claim against them for several reasons.  The supervisory defendants argue that the complaint is an impermissible shotgun pleading, and they assert that Mr. Renney should have to pursue claims against them through a state administrative procedure.  (Doc. 17, pp. 10-13; Doc. 39, pp. 10-13).  The supervisory defendants also argue that Mr. Renney has not stated a plausible § 1983 claim of deliberate indifference to medical needs against them and that the

doctrine of qualified immunity bars the individual-capacity claims against them.  (Doc. 17, pp. 14-21; Doc. 39, pp. 14-21).[8]  The Court addresses these arguments in turn.

Mr. Renney's complaint is not a shotgun pleading.  Mr. Renney's allegations give the supervisory defendants adequate notice of the § 1983 deliberate indifference to medical needs claim against them and the factual bases for the claim.  The Court will not strike or dismiss the complaint on this ground.

With respect to available state procedures, the supervisory defendants contend that Mr. Renney could seek relief through the Alabama Board of Adjustment, the entity on which the Alabama Legislature has conferred jurisdiction to resolve, among other things, "all claims" for personal injuries to convicts and all damages claims for personal injury resulting from harm caused by the State of Alabama "'or any of its agencies, commissions, boards, institutions or departments.'"  (Doc. 17, pp. 12-13; Doc. 39, pp. 12-13) (quoting Ala. Code § 4l-9-62(a)(l) and citing Ala. Code § 4l-9-62(a)(2)).  The supervisory defendants have not provided authority, and the Court has not found authority, that suggests that the availability of an administrative process to pursue damages from the State for personal injuries substitutes for or otherwise eliminates a § 1983 claim for monetary damages against supervisory officials in their individual capacities.  *See Barefield v. Dunn*, ___ F. Supp. 3d ___, 2023 WL 5417550,

---

[8]  The supervisory defendants also argue that state-agent immunity bars Mr. Renney's state-law claims against them.  (Doc. 17, pp. 22-23; Doc. 39, pp. 22-23).  Because Mr. Renney does not assert state law claims against the supervisory defendants, the Court will not address this argument.

*13 (M.D. Ala. Aug. 22, 2023) (stating that "relief at the Board of Adjustment would still not trigger Eleventh Amendment immunity because it has long been settled that the existence of a state-law remedy does not supplant Barefield's federal claims") (citing *Monroe v. Pape*, 365 U.S. 167, 183 (1961), *overruled on other grounds by Monell v. Dep't. of Soc. Serv. Of City of N.Y.*, 436 U.S. 658 (1978)).

The supervisory defendants argue that Mr. Renney has not alleged that they were directly involved in a constitutional violation and that in the absence of such an allegation, Mr. Renney has not pleaded facts "giving rise to a plausible individual-capacity claim" for deliberate indifference to medical needs under § 1983.  (Doc. 17, pp. 14-17; Doc. 39, pp. 14-16).  Mr. Renney's deliberate indifference claim arises under the Eighth Amendment.  The Eighth Amendment:

> forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend VIII. The Supreme Court first held in *Estelle v. Gamble* that the Cruel and Unusual Punishments Clause should be understood to prohibit government officials from exhibiting "deliberate indifference to [the] serious medical needs of prisoners." 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

*Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024).  To prove that a prison official violated the Eighth Amendment, a prisoner must establish an objectively serious medical need and the prison official's subjective awareness that his own conduct, whether it be action or inaction, "put the plaintiff at substantial risk of serious harm," with the caveat that  "even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual

Punishments Clause' if he 'responded reasonably to the risk.'" *Wade*, 106 F.4th at 1258, 1262 (quoting *Farmer*, 511 U.S. at 844-45).[9]

What's more, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Roy v. Ivy*, 53 F.4th 1338, 1351-52 (11th Cir. 2022). To proceed on a claim against a supervisory official, a prisoner must plead specific facts that, if proven, would demonstrate that "the supervisor personally participated in the alleged unconstitutional conduct" and/or that "there was a causal connection between the actions [or inactions] of a supervising official and the alleged constitutional deprivation." *Roy*, 53 F.4th at 1352.

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Roy*, 53 F.4th at 1352 (quoting *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014)). "'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" *Keith*, 749 F.3d at 1048 (quoting *Hartley v.*

---

[9] The supervisory officials "do not contest that Mr. Renney had serious medical needs." (Doc. 40, p. 4; Doc. 50, p. 4).

*Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999)).

The supervisory defendants are correct; Mr. Renney does not allege that the Commissioner of ADOC, the Associate Commissioner of Health Services at ADOC, or the Warden of the Limestone Correctional Facility personally caused delay in the treatment for his infected foot. Therefore, to survive the supervisory defendants' motion to dismiss, Mr. Renney must allege facts that indicate that one or more of the supervisory defendants engaged in conduct that was causally connected to the surgical amputations on his left foot and that the supervisory defendants knew that their action or inaction put Mr. Renney at substantial risk of serious harm. Mr. Renney's allegations satisfy this test; he alleges facts support an inference that the supervisory defendants knew that the medical providers at Limestone would delay treatment and unlawfully failed to intervene to stop them from doing so.

The supervisory defendants argue that Mr. Renney alleges that they "perhaps knew about [his] condition – but this is a conclusory allegation, not backed up by any facts pleaded in the complaint, and so not entitled to a presumption of truth at the motion to dismiss stage." (Doc. 40, p. 5). The supervisory defendants add that in alleging that they "had knowledge of certain institutional deficiencies at any Alabama state correctional facility is not the same as alleging that each moving defendant knew Mr. Renney had a serious medical need, and that they were deliberately indifferent to his necessary medical needs." (Doc. 40, p. 5; Doc. 50, p. 5).

But Mr. Renney alleges just that – that the defendants, because of their obligation under the *Braggs* consent order to review the medical reports provided to them, knew, for example, that an outside medical provider in April 2021 reported that Mr. Renney needed surgery as soon as possible, but the contract providers at Limestone delayed surgery until October 2021.   Mr. Renney alleges that Commissioners Hamm and Dunn and Associate Commissioner Naglich, as participants in the *Braggs* litigation and pursuant to the consent order, "implemented a computerized system identifying and tracking those prisoners with disabilities and the accommodations the prisoners required."  (Doc. 76, p. 17, ¶ 66); *see Braggs*, 2:14-cv-601, Doc. 728, pp. 32-35.  Mr. Renney contends that the supervisory defendants periodically received this computerized medical information via a "Special Needs report" that included information regarding the treatment of and accommodations for diabetic prisoners.  (Doc. 76, p. 17, ¶¶ 66-69); *see Braggs*, 2:14-cv-601, Doc. 728, pp. 33, 58-59.[10]  The *Braggs* consent decree mandates that "ADOC personnel" receive the medical information collected on an individual with a physical disability and that the "facility Wardens" and "ADOC's Office of Health Services" headed by Associate Commissioner Naglich receive written reports of audits to ensure compliance with

---

[10] Notably, given Mr. Renney's reliance on the Special Needs reports, in support of their motions to dismiss, the supervisory defendants could have placed the reports in the record to demonstrate that the reports do not contain information about Mr. Renney.  *See Tellabs,* 551 U.S. at 322 and *Brooks*, 116 F.3d at 1369, discussed above on page 5.  The Court has not located Special Needs reports in the record.

their obligations to track and provide adequate care and accommodations for prisoners with disabilities. *Braggs*, 2:14-cv-601, Doc. 728, pp. 33, 58-59; (Doc. 76, pp. 5, 17-18, ¶¶ 13, 66-69). Mr. Renney sufficiently alleges that the supervisory defendants received the Special Needs reports and medical information regarding disabled prisoners such that the supervisory defendants had actual knowledge of his serious need for medical treatment of his diabetic foot infection and of the significant delay in that treatment that caused him to lose his left toes and the top part of his left foot.[11]

Mr. Renney also alleges that despite their subjective knowledge of his serious

---

[11] The *Braggs* consent decree states that an inmate who has a physical impairment "that substantially limits one or more major life activities" is a "qualified individual with a disability" to whom the consent decree applies. *Braggs*, 2:14-cv-601, Doc. 728, p. 9. Mr. Renney alleges that under the ADA, his diabetes is a physical disability. (Doc. 76, p. 39, ¶ 39); *see* 29 C.F.R. § 1630.2(j)(3)(iii) (under the ADA, diabetes is a physical impairment that "will, at a minimum, substantially limit . . . endocrine function"). Because Mr. Renney has a physical disability, the *Braggs* consent decree applies to him and his medical care. (Doc. 76, pp. 14-15, 76 ¶¶ 54, 170); *Braggs*, 2:14-cv-601, Doc. 727, p. 6; Doc. 728, p. 11). Because the consent decree required ADOC to track electronically all prisoners with a physical disability, the Court infers that the Special Needs reports included Mr. Renney's medical information, including the "care and any accommodations" that were "directed or ordered by ADOC's medical providers" for him. *See Braggs*, 2:14-cv-601, Doc. 728, p. 58.

At this stage of the litigation, based on the requirements in the *Braggs* consent order, the Court infers that the Special Needs reports sent to the supervisory defendants included information about Mr. Renney's diabetes and his diabetic left foot infection; the April 8, 2021 recommendation that Mr. Renney undergo surgery "sooner than later" to remove the tip of his left big toe to prevent the spread of infection, (Doc. 76, pp. 19-20, ¶¶ 75-79); and reports that from April through July 2021, Mr. Renney's infection in his big toe spread, (Doc. 76, p. 21, ¶¶ 87-88). The Court infers that the Special Needs reports indicated that Mr. Renney's surgery on his big toe was delayed from April 8, 2021 until October 21, 2021, causing Dr. Sterling to amputate Mr. Renney's entire left big toe, (Doc. 76, pp. 23-24, ¶¶ 99-102), and that Mr. Renney's infection spread to his second left toe, causing his stay in the Limestone health care unit from April 5 through April 18, 2022, (Doc. 76, pp. 26-27, ¶¶ 115-16). The Court infers that the reports informed the supervisory defendants that Mr. Renney's infection on his second left toe became worse between May and August 2022, (Doc. 76, pp. 30-31, ¶¶ 132-36); and led to an additional surgery, fever, and pain. (Doc. 76, pp. 19, 22-23, 29, 31, ¶¶ ¶¶ 74, 94, 125, 136-37).

medical needs and their obligation under the *Braggs* consent decree to track his care, the supervisory defendants disregarded his serious medical needs by failing to ensure that he received constitutionally adequate medical care.  (Doc. 76, pp. 17-18, ¶¶ 65-70).  Mr. Renney asserts that the supervisory defendants had authority to order the appropriate treatment for him, but the supervisory defendants failed to ensure prompt surgery to stop his infection and avoid amputations on his left foot.  (Doc. 76, pp. 11, 17-18 ¶¶ 34-37, 65, 69-70).  Mr. Renney alleges that the supervisory defendants generally neglected the needs of diabetic prisoners and they their policy of neglecting the medical needs of diabetic prisoners, needs that they had the ability to meet, "result[ed] in [his] big toe and left second toe being amputated, followed by all toes on his left foot and the first inch of his left foot being amputated."  (Doc. 76, p. 18 ¶¶ 69-70).  At the motion to dismiss stage, Mr. Renney's allegations regarding the supervisory officials' subjective knowledge of his serious medical needs and the supervisory defendants' inaction plausibly support a claim against the supervisory defendant for deliberate indifference to his serious medical needs.

The supervisory defendants argue that because Mr. Renney received medical care from "contracted medical professionals at Limestone" and "outside" medical professionals, "ADOC officials were entitled to rely on the medical judgment of the medical professionals who provided care to [Mr.] Renney" and were not deliberately indifferent to Mr. Renney's medical needs.  (Doc. 17, p. 16; Doc. 39, p. 16; Doc. 40,

p. 7; Doc. 50, p. 7).  The problem, of course, is that Mr. Renney alleges that the outside medical professionals recommended prompt treatment, and the supervisory officials did not intervene when the contract medical providers at Limestone delayed treatment. (Doc. 76, pp. 19-20, 23-24, ¶¶ 75, 76, 78, 98-100).  Thus, the supervisory defendants' argument concerning their reliance on the advice of medical professionals does not support dismissal of Mr. Renney's deliberate indifference claim.  *See Ireland v. Prummell*, 53 F.4th 1274, 1293 (11th Cir. 2022) ("[E]ven where medical care is ultimately provided, a [government] official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."); *Thomas v. City of Jacksonville,* 731 Fed. Appx. 877, 882 (11th Cir. 2018) ("[O]ne who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.") (quoting *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (internal quotation marks omitted); *Brennan v. Comm'r, Alabama Dep't of Corr.*, 626 Fed. Appx. 939, 943 (11th Cir. 2015) ("Brennan's allegation that Oakes and Dr. Talley were aware that he needed treatment, including surgery, but that he did not get that treatment for nearly four months, stated a plausible claim for relief.").

"'It is not enough,'" of course, for Mr. Renney to demonstrate that he has adequately pleaded an Eighth Amendment deliberate indifference claim against the

supervisory defendants.  *Keith*, 749 F.3d at 1048. He "must also overcome [the supervisory defendants'] assertion of qualified immunity by proving (1) that [the supervisory defendants] violated [his] federal constitutional right, and (2) that the constitutional right was 'clearly established'" when the supervisory defendants failed to ensure that he received medical treatment needed for his serious medical condition. *Keith*, 749 F.3d at 1048 (quoting *Pearson v. Callahan,* 555 U.S. 223, 232, (2009)).[12] "'The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [state official] that his conduct was unlawful in the situation he confronted.'"  *Keith*, 749 F.3d at 1048 (quoting *Loftus v. Clark–Moore,* 690 F.3d 1200, 1204 (11th Cir. 2012) (brackets and emphasis in *Loftus*) (internal quotation marks omitted)).  A state official must have "fair warning" that his conduct violated a constitutional right.  *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

There are three ways to demonstrate that an official had fair warning that his acts or omissions violated a constitutional right.

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the

---

[12] An official who asserts the defense first must establish that he was acting within the scope of his discretionary authority when the alleged constitutional infraction occurred.  *Carter v. Butts Co., Ga.*, 821 F.3d 1310, 1319 (11th Cir. 2016).  Mr. Renney does not challenge the supervisory defendants' assertion that they acted within the scope of their discretionary authority.  (Doc. 17, p. 19; Doc. 32-1).

> plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant state Supreme Court].

*Gaines*, 871 F.3d at 1208 (bracketed text and italics in *Gaines*) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012)).  The broad established principle that governs Mr. Renney's claim is well-settled.  As noted in *Wade*, in *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."  *Estelle*, 429 U.S. at 104 (internal citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  It also is well-settled that state officials violate an inmate's Eighth Amendment rights by failing to provide medical care or by unreasonably delaying access to medical care such that an inmate "needlessly suffer[s]" severe pain.  *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (unexplained delay of hours in treating broken foot states *prima facie* case of deliberate indifference); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (reversing summary judgment entered in favor of physician where inmate "was permitted to suffer from pain, bleeding and swollen gums and periodic weight loss, and the defendants . . . offered no reasonable medical reason for the fifteen-month delay" in providing treatment).

The Eleventh Circuit's decision in *Harris v. Coweta Co.*, 21 F.3d 388 (11th Cir. 1994), is one of several that notified the supervisory defendants that their inaction

violated Mr. Renney's constitutional right.  While incarcerated, Mr. Harris sought medical treatment for his left hand because several fingers had "curled up," and his fingernails had grown into the palm of his hand, preventing him from opening his fingers. *Harris*, 21 F.3d at 389, 392.  Sheriff Hammett knew that Mr. Harris needed "immediate medical attention," including a nerve conduction test. *Harris*, 21 F.3d at 391.  Mr. Harris waited six weeks for a nerve conduction study.  The results revealed that Mr. Harris required surgery "as soon as possible . . . ." *Harris*, 21 F.3d at 392.  Mr. Harris saw a surgeon who agreed that he needed surgery, but the surgeon recommended that the surgery be done at the state medical facility. *Harris*, 21 F.3d at 392.

Based on this information, the prison doctor informed Sheriff Hammett that Mr. Harris needed surgery "as soon as practical and preferably sooner than later" but did not need surgery on an "emergency basis" and a "delay of 1-2 weeks [would] not drastically affect [Mr. Harris's] recovery . . . ." *Harris*, 21 F.3d at 392.  Mr. Harris was transferred to the state prison system on January 30, 1991, and his surgery took place six weeks after he arrived. *Harris*, 21 F.3d at 392.  During the delay in treatment, Mr. Harris received only pain medication. *Harris*, 21 F.3d at 391, n. 2.

The Eleventh Circuit held that Sheriff Hammett was not entitled to qualified immunity with respect to Mr. Harris's deliberate indifference claim. *Harris*, 21 F.3d at 394.  The Eleventh Circuit found that the "prominent unexplained delay" from

November 29, 1990, when the sheriff knew about Mr. Harris's serious medical condition, through January 16, 1991, when the nerve conduction test was performed, was "objectively unreasonable" given the preexisting law and the sheriff's subjective knowledge. *Harris*, 21 F.3d at 394.  The Eleventh Circuit held that the "contours of unreasonable delay in providing treatment for serious medical needs were defined with enough particularity to allow a reasonable sheriff with Sheriff Hammett's information to understand whether his actions were lawful" and that a "reasonable sheriff would have known that delaying prescribed treatment for a serious medical need for several weeks for a nonmedical reason may violate an inmate's constitutional rights." *Harris*, 21 F.3d at 394.  The Eleventh Circuit found that the "law was clearly established that several weeks was too long to fail to properly respond" to Mr. Harris's serious medical need. *Harris*, 21 F.3d at 394.  The Eleventh Circuit concluded:  "Inaction in the face of a known serious medical need" and a "prescribed course of care . . . [was] not conduct that a sheriff could reasonably consider lawful." *Harris*, 21 F.3d at 394; *see also Melton v. Abston*, 841 F.3d 1207, 1230, 1232 (11th Cir. 2016) (holding that it was clearly established that "[d]eliberate indifference to serious medical needs may be shown" by proof of "a delay in treatment which results in additional pain and suffering," by proof that a government official delayed "necessary medical treatment for nonmedical reasons," or by "'proving a policy of deficiencies in staffing or procedures such that the [prisoner] is

effectively denied access to adequate medical care.'") (quoting *Thomas v. Town of Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988)).

Mr. Renney has adequately alleged that the supervisory defendants delayed his treatment because of deficiencies in staffing and that the delay caused him to suffer additional pain and suffering. Therefore, the supervisory defendants are not entitled to qualified immunity.

For the reasons discussed, the Court denies the supervisory defendants' motions to dismiss Mr. Renney's § 1983 deliberate indifference to medical needs claims against them.

### *Dr. Padgett's Motion to Dismiss*

Dr. Padgett argues that Mr. Renney's § 1983 deliberate indifference to medical needs claim against him is "deficient in that it makes claims against multiple defendants without delineating or specifying which [claims] apply to which Defendant" and does not "specify a date and time that the alleged acts and/or omissions occurred." (Doc. 78, p. 5). Dr. Padgett also argues that Mr. Renney has not provided a "detailed specification and factual description of each act and omission" for his medical malpractice claim which the Alabama Medical Liability Act requires. (Doc. 78, p. 2).

Mr. Renney has explained that he grouped defendants in the amended complaint to "generally describe the denial of medical care for which they were

jointly responsible," including "their omissions for failing to prescribe intravenous antibiotics or promptly schedule a surgical consult." (Doc. 81, p. 7). Mr. Renney does not attribute every act or omission generally to all defendants; instead, he identifies the defendants who were involved in his medical care during the time frames he describes in his amended complaint.

Mr. Renney alleges that Dr. Padgett was involved in his care in July 2021 when Dr. Padgett re-ordered an orthopedic shoe for Mr. Renney. (Doc. 76, p. 22, ¶ 90). Mr. Renney contends that Dr. Padgett treated him at Limestone and observed the infection in his left foot, knew that he "recently suffered an amputation on his toe to prevent the spread of a diabetic ulcer, and knew that [he] remained at high risk of reoccurring infection." (Doc. 76, p. 25, ¶¶ 105-106, 108). Mr. Renney alleges that Dr. Padgett treated him between April 5 and April 18, 2022 when Mr. Renney "stayed in the Limestone health care unit" because "his second toe was disintegrating" from infection. (Doc. 76, pp. 26-27, ¶¶ 115-117). Mr. Renney asserts that Dr. Padgett observed his wound, reviewed his medical records, and "knew that Mr. Renney needed immediate surgery, oral antibiotics, and/or intravenous antibiotics," but Dr. Padgett did not address Mr. Renney's serious medical needs. (Doc. 76, pp. 26-27, ¶¶ 116-17). According to Mr. Renney, Dr. Padgett knew about Dr. Sterling's May 10, 2022 surgery recommendation to amputate the two joints of Mr. Renney's second toe on his left foot, but Dr. Padgett

did not promptly schedule Mr. Renney for surgery.  (Doc. 76, pp. 30-31 ¶¶ 130-31, 137).  Mr. Renney contends that Dr. Padgett's inaction created a "substantial risk of serious harm and injury from inadequate medical care in violation of § 1983 and the Eighth Amendment" and proximately caused him to lose "his second toe and eventually all of his left toes and the first one inch of his left foot" because Dr. Padgett did not promptly schedule surgery and prescribe intravenous antibiotics. (Doc. 76, pp. 30-31, 34-35, ¶¶ 130-31, 137, 149, 154).

These factual allegations are sufficient to support a claim against Dr. Padgett for deliberate indifference to Mr. Renney's serious medical needs.  *See Melton*, 841 F.3d at 1230.  Viewing Mr. Renney's allegations in the light most favorable to him, he has plausibly pleaded that Dr. Padgett was subjectively aware of his serious medical needs but deliberately disregarded those needs, causing Mr. Renney to suffer pain and the loss of all toes on and part of his left foot.  If these allegations are proven, they will demonstrate that Dr. Padgett violated Mr. Renney's clearly established constitutional right to be free from deliberate indifference to serious medical needs.

Mr. Renney also has sufficiently alleged a medical malpractice claim against Dr. Padgett.  As Dr. Padgett asserts, under the Alabama Medical Liability Act, a plaintiff alleging a medical malpractice claim must "include in the complaint . . . a detailed specification and factual description of each act and omission alleged by

plaintiff to render the health care provider liable to plaintiff" and must "include when feasible and ascertainable the date, time, and place of the act or acts." Ala. Code § 6–5–551. The Alabama Supreme Court has held that under § 6–5–551, "although every element of the cause of action need not be stated with particularity, the plaintiff must provide the defendant health care provider fair notice of the allegedly negligent act and must identify the time and place it occurred and the resulting harm." *Mikkelsen v. Salama,* 619 So. 2d 1382, 1384 (Ala.1993). Dr. Padgett urges the Court to apply Alabama's heightened pleading standard, but the standard does not apply in federal court.

When federal courts consider state law claims under either diversity jurisdiction or pendent jurisdiction "'only substantive state law must be applied,' while 'federal law governs matters of procedure.'" *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259 (11th Cir. 2015) (quoting *Lundgren v. McDaniel*, 814 F.2d 600, 605 (11th Cir. 1987)).; *see also Hanna v. Plumer,* 380 U.S. 460, 465 (1965) ("[F]ederal courts are to apply state substantive law and federal procedural law."). "Thus, where a state employs a heightened pleading requirement, 'a federal court . . . should instead follow Fed. R. Civ. P. 8(a).'" *Palm Beach Golf*, 781 F.3d at 1260 (quoting *Caster v. Hennessey*, 781 F.2d 1569, 1570 (11th Cir. 1986)). "[T]he United States Supreme Court has rejected a heightened pleading standard in federal court, except where such a requirement is

specifically delineated by the federal rules." *Palm Beach Golf*, 761 F.3d at 1260 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2020), and holding that the district court's dismissal of the plaintiff's claim "on the basis that it failed to satisfy Florida's heightened pleading standard was error").

Mr. Renney's allegations against Dr. Padgett meet the pleading standard of Rule 8 of the Federal Rules of Civil Procedure. Mr. Renney alleges the time frames in which Dr. Padgett treated him at Limestone and the harm that Dr. Padgett's alleged inadequate medical care caused. Dr. Padgett has fair notice of the facts underlying the medical malpractice claim. In fact, Dr. Padgett has responded to the allegations in Mr. Renney's amended complaint. (Doc. 77).

Accordingly, the Court denies Dr. Padgett's motion to dismiss.

### ADOC's Motion to Dismiss

ADOC asks the Court to dismiss Mr. Renney's ADA and Rehabilitation Act claims against it because Mr. Renney's "factual allegations are insufficient to state a claim for damages against ADOC." (Doc. 20). ADOC argues that in his amended complaint, Mr. Renney does not sufficiently allege that "any qualifying ADOC official evidenced the requisite 'deliberate indifference' to his medical needs necessary for seeking damages under the ADA." (Doc. 20, pp. 2-3).

Title II of the ADA "prohibits public entities from discriminating against qualified individuals with disabilities." *Christmas v. Nabors*, 76 F.4th 1320, 1333

(11th Cir. 2023) (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007)); s*ee* 42 U.S.C. § 12132. "Section 504 of the Rehabilitation Act contains an analogous prohibition." *Christmas*, 76 F.4th at 1333. Thus, a district court assesses "discrimination claims under both statutes using 'the same standards.'" *Christmas*, 76 F.4th at 1333 (quoting *J.S., III ex rel. J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017)).

To state a claim under the ADA or the Rehabilitation Act, a plaintiff must allege facts plausibly showing "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Christmas*, 76 F.4th at 1333 (internal quotations and citations omitted). Because Mr. Renney seeks monetary damages for the alleged violations, he must also allege facts plausibly showing that ADOC "'engaged in intentional discrimination, which requires a showing of deliberate indifference.'" *Christmas*, 76 F.4th at 1333 (quoting *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022))

"A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights" under the ADA or the Rehabilitation Act. *McCullum v. Orlando Regional Healthcare Sys., Inc.*, 768 F.3d 1135, 1147

(11th Cir. 2014). Under the ADA, the deliberate indifference standard requires that

"'the defendant knew that harm to a federally protected right was substantially likely

and . . . failed to act on that likelihood.'" *Silberman v. Miami Dade Transit*, 927

F.3d 1123, 1134 (11th Cir. 2019) (quoting *Liese v. Indian River Cnty. Hosp. Dist.*,

701 F.3d 334, 334 (11th Cir. 2012)). To state a claim against ADOC under the ADA

or the Rehabilitation Act, Mr. Renney must demonstrate that an "'official who at a

minimum has authority to address the alleged discrimination and to institute

corrective measures on the [entity's] behalf' had 'actual knowledge of

discrimination in the [entity's] programs and fail[ed] adequately to respond.'"

*Silberman*, 927 F.3d at 1134 (quoting *Liese*, 701 F.3d at 349). "[T]hat 'official'

must be 'high enough up the chain-of-command that his [or her] acts constitute an

official decision by the [entity] not to remedy the misconduct.'" *Silberman*, 927

F.3d at 1134 (quoting *Houston Cnty. Bd. of Educ.*, 877 F.3d at 987).

Here, Mr. Renney alleges sufficient facts to support ADA and Rehabilitation

Act claims against ADOC. Mr. Renney is a qualified individual with a disability.

As discussed, Mr. Renney sufficiently alleges that the supervisory defendants had

subjective knowledge of his serious medical needs and recommended treatment and

accommodations, including his need for orthopedic shoes and prompt surgeries to

stop the spread of infection, and the defendants were deliberately indifferent to his

serious medical needs. (*See supra*, pp. 20-25). Mr. Renney plausibly alleges that

the supervisory defendants received the Special Needs report that included Mr. Renney's medical information and prescribed accommodations for his disability, that given those reports the supervisory defendants knew that he needed prompt surgeries and accommodations for his disability, and that the supervisory defendants did not act, despite their ability and authority to act to ensure that Mr. Renney received needed medical care and accommodations.  (Docs. 76, pp. 11, 17-18, 40, ¶¶ 34-37, 65-69, 172-73).[13]  Mr. Renney alleges that ADOC's "deliberate refusal to accommodate [his] disability-related needs for medical care constitutes exclusion from participation in denial of the benefits of Limestone's 'services, programs, or activities.'"  (Doc. 76, pp. 39- 40, ¶ 172).  Mr. Renney contends that ADOC, through its officials, denied services by "(1) failing to ensure that Mr. Renney received orthopedic shoes; (2) failing to ensure that Mr. Renney received adequate nutrition, which in turn adversely affected his glucose levels, preventing his wounds from

---

[13]  Mr. Renney mistakenly used paragraphs 172 and 173 twice.  The Court cites to Mr. Renney's first use of paragraphs 172 and 173.  (Doc. 76, pp. 39-40).

Mr. Renney does not allege that the *Braggs* consent decree itself is an admission of liability.  Instead, Mr. Renney alleges that the supervisory defendants' obligation under the *Braggs* consent decree to track the care of and accommodations for disabled inmates and the supervisory defendants' receipt of Mr. Renney's medical information regarding his serious medical needs and prescribed accommodations via the Special Needs report evidence the supervisory defendants' subjective knowledge of his serious medical needs.  (Doc. 76, pp. 17-18, ¶¶ 65-69).  Mr. Renney alleges that, despite this knowledge, the supervisory defendants took no corrective action to ensure that he received adequate medical care or the prescribed accommodations for his disability.  (Doc. 76, pp. 17-18, ¶¶ 65-69).  ADOC acts through the supervisory defendants.

healing and from fighting infection; and (3) [denying] regular access to his prescribed pain medication." (Doc. 76, p. 40, ¶ 173).

Thus, Mr. Renney sufficiently alleges that despite its knowledge of his serious medical needs through the supervisory defendants, ADOC was deliberately indifferent to those needs, took no action to meet his disability-related needs, and denied benefits to him because of his disability in violation of the ADA and the Rehabilitation Act. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) (stating that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as . . . medical care . . . constituted "exclu[sion] from participation in or ... deni[al of] the benefits of" the prison's "services, programs, or activities" under the ADA).

Mr. Renney's allegations sufficiently state a claim under the ADA and Rehabilitation Act claim against ADOC for monetary damages for the supervisory defendants' alleged deliberate indifference to Mr. Renney's serious medical needs. Therefore, the Court denies ADOC's motion to dismiss.

## IV.

Accordingly, the Court denies the supervisory defendants' motions to dismiss, (Docs. 16, 38); denies Dr. Padgett's motion to dismiss, (Docs. 70, 78); and denies ADOC's motion to dismiss, (Doc. 20). The Court directs the Clerk to please TERM Docs. 16, 20, 38, 70, and 78.

The Court dismisses without prejudice fictitious defendants "Warden John Doe I" and "Nurse John Doe II."

The Court directs the Clerk to please TERM Doc. 79 as moot.

**DONE** and **ORDERED** this September 13, 2024.

_(signature)_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE